**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THOMAS E. PEREZ, Secretary of Labor, United States Department of Labor<br><br>Plaintiff,<br><br>v.<br><br>VALLEY GARLIC, INC., dba SEQUOIA PACKING CO., a California Corporation; CHRISTIAN BARRERE MARRIONE, an individual; DAVID CLARK ANDERSON, an individual; X-TREME AG LABOR, INC., a California corporation; ISABELLA ALVAREZ CAMACHO, an individual; OFELIA RAMIREZ MORALES, an individual; and CESAR NERI, an individual,<br><br>Defendants. | **CASE NO. 1:16-CV-01156-AWI-EPG**<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

**I. Introduction**

Plaintiff Thomas E. Perez is the United States Secretary of Labor ("the Secretary"). The Secretary is charged with enforcing the Fair Labor Standards Act of 1938 ("FLSA") and the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"). The Secretary alleges FLSA and AWPA claims against defendants Valley Garlic Inc. ("Valley Garlic"), a garlic processing and packing plant, X-Treme Ag Labor Inc. ("X-Treme Ag"), a farm labor contractor,

and several of their respective managerial and supervisory employees.[1] Specifically, the Secretary alleges that X-Treme Ag and its named employees unlawfully transported field workers to and from the Valley Garlic worksites, failed to pay farm laborers wages when due, and failed to keep accurate time records. The Secretary further alleges that Valley Garlic and its named employees knew about and ignored the transportation violations by X-Treme Ag., failed to pay farm laborers wages when due, and failed to keep accurate time records.

Based on those allegations and the evidence submitted in support, the Secretary moves for a preliminary injunction, (1) "[e]njoining … Valley Garlic [and its employees] from failing to take reasonable steps … to ensure [that] Valley Garlic's farm labor contractors ("FLCs") do not engage in unlicensed transportation of migrant or seasonal agricultural workers" and (2) "[e]njoining … X-Treme Ag [and its employees] from (a) transporting, or directing the transportation of, migrant or seasonal workers … and (b) hiring, using, or employing any person to transport migrant and seasonal agricultural workers without a proper [c]ertificate…." Doc. 7 at 6. X-Treme Ag opposes the preliminary injunction, arguing that the injunction as to it is moot because X-Treme Ag ceased operation as a farm labor contractor after the Secretary refused to re-issue its FLC certificate of registration. Doc. 17. Valley Garlic also opposes the preliminary injunction, arguing in large part that it has no obligation to ensure that the FLCs that it contracts with comply with the AWPA when those FLCs engage in activity that they were not hired or contracted to perform. Doc. 19.

For the following reasons, the Secretary's motion for preliminary injunction will be granted in part and denied in part.

## II. Background

Valley Garlic does business as Sequoia Packing Company in Coalinga, California, where it plants, grows, harvests, processes, and packs garlic for sale throughout the country. Complaint, Doc. 1 ("Compl.") at ¶ 5. As part of its operation, Valley Garlic contracts with FLCs to provide

---

[1] None of the named employees of either corporation submitted separate oppositions. When the Court refers to arguments by "Valley Garlic," those arguments are also the position of Valley Garlic's named employees—Christian Barrere Marrione and David Clark Anderson.  When the Court refers to arguments by "X-Treme Ag," those arguments are also the position of X-Treme Ag's employees—Isabella Alvarez Camacho, Ofelia Rarmirez Morales, and Cesar Neri.

its field labor. Defendant Christian Barrere Marrione ("Marrione") is the general manager of Valley Garlic. Compl. at ¶ 7. In that role, Marrione was authorized "to enter into contracts on behalf of Valley Garlic, establish the company's policies and practices with respect to employees and FLCs, and set the terms and conditions of employees' employment." Compl. at ¶ 7. Marrione entered into one of several contracts with X-Treme Ag on behalf of Valley Garlic for the 2015 garlic season. Compl. at ¶ 7. Defendant David Clark Anderson ("Anderson") is the field manager of Valley Garlic. Compl. at ¶ 8. In that role, Anderson "oversees and supervises the field labor performed by Valley Garlic employees, including employees recruited and hired by FLCs." Compl. at ¶ 8. Anderson also "establishes the terms and conditions of employees' work, including … setting work hours and dates, establishing pay rates, approving compensation, and determining the method and manner of field work to be performed." Compl. at ¶ 8. Anderson signed one of the several contracts between Valley Garlic and X-Treme Ag on behalf of Valley Garlic for the 2015 garlic season. Compl. at ¶ 8.

     X-Treme Ag is a FLC that recruited, solicited, hired, employed, and transported migrant and seasonal agricultural workers. Compl. at ¶ 9. Defendant Isabella A. Camacho ("Camacho") is the president and 100% shareholder of X-Treme Ag. Compl. at ¶ 10. Defendant Ofelia Ramirez Morales ("Ramirez Morales") was an employee and crew leader of X-Treme Ag. Compl. at 11. Defendant Cesar Neri was also an employee of X-Treme Ag. Compl. at 12. Camacho, Ramirez Morales, and Neri all performed FLC recruitment, solicitation, hiring, employment, furnishing, and transportation activities. Compl. at ¶¶ 10-12.

     X-Treme Ag contracted to supply workers for Valley Garlic's harvesting and planting operations for the 2015 season. Compl. at ¶ 13. The contracts between X-Treme Ag and Valley Garlic prohibited X-Treme Ag from transporting workers to the Valley Garlic worksites. Specifically, the contracts provide "that [X-Treme Ag] is not authorized to transport any workers who perform work under th[e] Agreement. Further, [X-Treme Ag] agrees that [it] will not allow any crew boss, mayordomo, foreperson, supervisor, or any other person with any supervisory authority to transport any workers who perform work under th[e] Agreement." May 26, 2015 Contract between Valley Garlic and X-Treme Ag., Doc. 24-1 ("First Contract") at 16. Despite

the prohibition on X-Treme Ag transporting workers to the Valley Garlic worksites, crew leaders Ramirez Morales, Nestor Leon, Jorge Hernandez, Carlos Carbajal, Martin Cuahutenango, Hector Ramirez, and Pedro Torres drove or arranged for transportation for their crew members. Compl. at ¶ 14; *see, e.g.,* Decl. of Norah Pedraza, Doc. 7-4 at ¶ 4. Each crew member was charged approximately $10.00 per day as a transportation fee. Compl. at ¶ 14.

Valley Garlic's supervisors and quality control employees oversaw the laborers provided by X-Treme Ag while they worked at the Valley Garlic worksites. Valley Garlic took no action other than including a contractual prohibition on transportation to ensure that X-Treme Ag did not transport workers to and from its worksites. Compl at ¶ 19.

In or around June 2015, Ramirez Morales recruited workers in Merced, California on behalf of X-Treme Ag to work at the Valley Garlic worksites. Compl. at ¶ 15. Ramirez Morales organized transportation of those workers in vehicles driven by Neri (her boyfriend), her daughter Laura Ramirez, and at least one of the crew members she recruited. Compl. at ¶ 15. Neither Neri nor Ramirez has a valid driver's license. Compl. at ¶ 15. On June 8, 2015, Ramirez Morales instructed Enrique Franco, a field worker she had recruited to work for Valley Garlic, to drive himself and seven other employees from Merced to the Valley Garlic worksites in Gilroy, and back to Merced again, in a white Chevrolet van owned by and registered to Neri. Compl. at ¶ 16. Franco did not have a valid driver's license. Compl. at ¶ 16. Franco drove himself and seven other workers as instructed on June 18, 19, and 20, 2015. Compl. at ¶ 16.

On the return trip from Gilroy to Merced on June 20, 2015, Franco fell asleep at the wheel and lost control of the vehicle on California State Highway 152 between Los Banos and Chowchilla. Compl. at ¶ 17. The vehicle crashed and rolled over multiple times, ejecting six passengers from the vehicle. Compl. at ¶ 17. Three workers died on site and one died less than a week later from injuries sustained in the accident. Compl. at ¶ 17. Franco and the remaining three passengers sustained non-fatal injuries. Compl. at ¶ 17.

After Marrione was informed of the accident, he sent a letter on behalf of Valley Garlic to "Camacho d/b/a X-Treme Ag," indicating that X-Treme Ag was "not authorized to transport any workers who provide services under" the agreement between Valley Garlic and X-Treme

Ag. Doc. 7-2 at 105. The letter continued, "the [DOL] investigator indicated the possibility that your supervisor or foreman was coordinating transportation. This is not allowed under [the] agreement and must stop immediately." Doc. 7-2 at 105. Beyond that letter, Valley Garlic did not take action to investigate transportation situation giving rise to the accident or to prevent further transportation of workers by X-Treme Ag.

Valley Garlic did not immediately terminate its contract with X-Treme Ag. Compl. at ¶ 19. Valley Garlic no longer uses X-Treme Ag as a FLC.

### III. Legal Standard

Federal Rule of Civil Procedure 65(a) governs requests for preliminary injunctions. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.' 'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Winter*, 555 U.S. at 24 (internal citations omitted); *see Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir.2012) (A preliminary injunction is a "drastic remedy that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.") The Ninth Circuit has adopted a "serious questions" approach to preliminary injunctions under which an injunction may issue if there are "serious questions going to the merits"—rather than likelihood of success on the merits—so long as the "balance of hardships that tips sharply towards the plaintiff ..., [and] plaintiff also shows there is a likelihood of irreparable injury and the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citing *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2000)).

Generally, when courts grant preliminary injunctions they prohibit a defendant from

taking action, "the purpose … [of which] is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014). A district court has the authority to issue a mandatory injunction that goes beyond maintaining the status quo and orders a responsive party to take action, *Marlyn Nutraceuticals, Inc. v. Mucos Phara GmbH & Co.*, 571 F.3d 874, 879 (9th Cir. 2009); *Coltharp v. Herrera*, 584 Fed.App'x. 334, 336 (9th Cir. 2014), however, such relief is "particularly disfavored" and should be denied "unless the facts and law clearly favor the moving party," *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (citation and internal quotation marks omitted). "In plain terms, mandatory injunctions should not issue in doubtful cases." *Garcia*, 786 F.3d at 740 (citation and internal quotation marks omitted).

## IV. Discussion

As a preliminary matter, the parties disagree regarding whether the preliminary injunction sought by the Secretary is mandatory or prohibitory. After the Court resolves that issue, it will discuss whether the *Winter* factors weigh in favor of granting a preliminary injunction and, if so, the scope and terms of the injunctive relief to be granted.

### A. Nature of the Injunction Sought

The parties disagree over the nature of the injunction sought. The Secretary suggests that the injunction he seeks would only require Valley Garlic to stop violating the law, thus the injunction sought "is plainly prohibitory." Doc. 27 at 13. Valley Garlic characterizes the proposed injunction as one that "actually imposes affirmative obligations on Defendants to implement and manage a comprehensive worker transportation program for the FLCs that it does business with," as such they argue that the injunction sought is mandatory. Doc. 19 at 6.

As the parties have aptly (if inadvertently) exhibited, the language used in shaping injunctive relief—"defendant shall obey the law" or "defendant shall not violate the law"—is easily manipulated. As a result, the Court's focus is not on the specific language used but whether the injunction would mark a departure from the status quo. If the injunction would preserve the status quo, it is prohibitory; if the injunction would require defendants to take an

action that they did not previously take, it is mandatory.

In this instance, the Secretary takes issue with Defendants' present practices and seeks to force Valley Garlic to monitor FLCs to ensure that they do not unlawfully transport workers to and from the Valley Garlic worksites. Specifically, the Secretary's proposed order suggests that the Court enjoin Valley Garlic "from failing to take reasonable steps … to ensure [that FLCs] that supply workers to Valley Garlic do not engage in unlicensed transportation…." Doc. 7-1 at 3. The Secretary's proposed order includes requirements that Valley garlic hold meetings with FLCs to create written plans whereby FLCs explain to Valley Garlic the details of recruitment and anticipated transportation, and mandate that all workers "check in with Valley Garlic management before parking…," among other requirements. Doc. 7-1 at 3. The Secretary further suggests that that Valley Garlic be compelled to produce a parking log, detailing the vehicles that arrived, the number of workers in each vehicle, and if the number of workers in a vehicle exceeds three, a copy of the driver license of the driver, the name of the person who arranged for the transportation, and any fee paid, all of which must be presented to the Secretary upon request. Doc. 7-1 at 4. The Secretary concedes that none of the conduct that it seeks to compel in its proposed injunction takes place under the status quo. Doc. 27 at 13. Because the Secretary seeks to compel a change in the status quo, the injunction he seeks is mandatory.[2]

**B. Success on the Merits**

To obtain a preliminary injunction, Plaintiff must first establish a likelihood of success on the merits. *Winter*, 555 U.S. at 20. The Secretary has alleged violations of AWPA and FLSA, either could serve as the basis for a preliminary injunction. Both are analyzed below.

As the Secretary notes, the purpose of the AWPA is to protect migrant and seasonal agricultural workers, who are particularly vulnerable, from unsafe working conditions. *See* 29 U.S.C. § 1801. The relevant protections afforded by the AWPA include motor vehicle safety requirements, 29 U.S.C. § 1841, requirements on agricultural employers to pay all wages owed in a timely manner, 29 U.S.C. §§ 1822 and 1832, and requirements on FLCs to disclose the

---

[2] The fact that the Secretary suggests that the relief it seeks "restrains and ongoing violation" does not change the nature of the injunctive relief sought.

conditions of employment to workers at the time of recruitment. To ensure that agricultural employers and FLCs do not violate those protections, the AWPA also has registration requirements applicable to FLCs, recordkeeping requirements applicable to agricultural employers and FLCs, and verification of FLC licensure requirements applicable to agricultural employers. *See* 29 U.S.C. §§ 1811, 1821(d), (e), 1831(c)(1), (d), 1842.

1. X-Treme Ag

The Secretary has proved, and X-Treme Ag does not dispute, that X-Treme Ag and its employees provided transportation to workers without a certification from the Secretary authorizing them to do so, in violation of 29 U.S.C. § 1811(a). *See* Doc. 7-3 at 5-6. The Secretary further alleges and X-Treme Ag has not disputed that X-Treme Ag did not ensure that each driver it utilized in (unlawfully) providing transportation services had a valid driver's license, in violation of 29 U.S.C. § 1841(b)(1)(B). *See* 29 C.F.R. § 500.41(a) ("A [FLC] is responsible for any violations of the [AWPA] committed by his [or her] employee….") It is clear to the Court that the Secretary is likely to prevail on the merits of its transportation related claims against X-Treme Ag and its employees.

2. Valley Garlic

The Secretary contends that Valley Garlic has an affirmative obligation under 29 U.S.C. § 1842 to take reasonable steps to ensure that no FLC that it utilizes transports agricultural workers to or from its worksites without certification from the Secretary. Section 1842 of Title 29 reads in relevant part as follows:

> No person[3] shall utilize the services of any farm labor contractor … unless the person first takes reasonable steps to determine that the farm labor contractor possesses a certificate of registration which is valid and which authorizes the activity for which the contractor is utilized.

FLC "activity means recruiting, soliciting, hiring, employing, furnishing, or transporting any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(6).

In order for Valley Garlic to have any obligation to take "reasonable steps" to confirm

---
[3] Valley Garlic and its supervisory employees are each "persons" within the meaning of the AWPA. 29 U.S.C. § 1802(9) ("The term 'person' means any individual, partnership, association, joint stock company, trust, cooperative, or corporation.")

8

1  that X-Treme Ag was authorized to transport workers, Valley Garlic must have "utilized" X-
2  Treme Ag to provide transportation within the meaning of the AWPA.
3      The parties seem to conflate the requirements of Section 1842—imposing requirements
4  upon a person who utilizes a FLC for a particular FLC activity—with those of Section 1841—
5  imposing requirements where an agricultural employer or FLC uses or causes to be used a
6  vehicle for transportation of workers. For instance, the Secretary emphasizes that "[a] grower
7  'cause[s] the transportation of harvest workers by a [FLC] when this transportation is a
8  "necessary element in obtaining the workers" to harvest the grower's crop.'" Doc. 27 at 4.
9  Whether a grower causes transportation of a worker is only relevant for Section 1841.
10 Additionally, the Secretary has emphasized the purpose of the AWPA is "to impose
11 responsibility on agricultural employers to ensure FLCs' compliance" with provisions of the Act.
12 Doc. 27 at 6. Although the AWPA does seek to achieve that purpose, Section 1842 is not so
13 sweeping.
14     The Secretary has explicitly noted that its request for preliminary injunction against
15 Valley Garlic is based exclusively on Section 1842, not on Section 1841. Doc. 27 at 5 n2. As a
16 result, whether Valley Garlic is an agricultural employer and whether it caused seasonal or
17 migrant workers to be transported are beside the point.[4] The Court will confine its discussion to
18 whether Valley Garlic utilized X-Treme Ag for transportation of workers.
19     Valley Garlic suggests that the utilize requirement of Section 1842 asks whether a person
20 contracted with a FLC to perform the specific FLC action. Doc. 19 at 9. If not, it suggests, the
21 person did not utilize the FLC for the specific FLC action and Section 1842 places no obligation
22 on that person to take reasonable steps to determine if the FLC possesses a certificate allowing it
23 to perform services that the FLC is not contracted or hired to perform.
24     The Secretary suggests that the utilize requirement of Section 1842 is not concerned with
25 whether a person *hires* a FLC for a specific action. Instead, it argues, the inquiry is whether the
26 person knows that the FLC that it hired is actually engaging in the specific FLC action as an
27 inherent part of the work arrangement, regardless of whether or not the FLC was contracted or

---

[4]*See* Note Five, *infra*.

9

hired to engage in that activity. Doc. 27 at 6.

The Court begins its statutory interpretation of Section 1842—as it must—with the plain meaning of the text. *See United States v. Kaplan*, --- F.3d ----, 2016 WL 4709870, *5 (9th Cir. Sept. 9, 2016) (quoting *Transwestern Pipeline Co. v. 17.19 Acres of Prop. Located in Maricopa Cty.*, 627 F.3d 1268, 1270 (9th Cir. 2010)). When the term in question is not defined, it "will be interpreted as taking [its] ordinary, contemporary, common meaning." *Kaplan*, 2016 WL 4709870 at *5 (citation omitted). However, "[s]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, --- U.S. ---, 136 S. Ct. 1061, 1070 (2016) (citation omitted). The plain meaning of a statute controls unless it would lead to absurd results. *White v. Pierce*, 834 F.2d 725, 728 (9th Cir. 1987) (citation omitted); *see Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012) ("If the statutory language is unambiguous and the statutory scheme is coherent and consistent, judicial inquiry must cease." (quoting *In re Ferrell*, 539 F.3d 1186, 1190 n.10 (9th Cir. 2008)).

By its plain language, for Section 1842 to be implicated a person must utilize a FLC for a specific FLC activity. If a person does utilize a FLC for a specific FLC activity, that person must take reasonable steps to determine that the FLC possesses a certificate of registration allowing the FLC to perform the specific FLC activity for which it is utilized. The AWPA does not define "utilize." The plain language of the statute could be read to support the Secretary's interpretation—any time a FLC conducts a FLC action that is necessary for the job that it is hired for, it is utilized to conduct that FLC action—or Valley Garlic's interpretation—a FLC is not utilized for a specific FLC action unless it is hired or contracted for that action. The meaning of utilize is ambiguous.

However, the legislative history in House Report No. 97-855 explaining Section 1842 sheds light on its purpose:

> SECTION 402 PROVIDES THAT NO PERSON SHALL UTILIZE THE SERVICES OF ANY FARM LABOR CONTRACTOR TO SUPPLY AGRICULTURAL WORKERS UNLESS SUCH PERSON TAKES REASONABLE STEPS TO DETERMINE THAT THE FARM LABOR

CONTRACTOR IS PROPERLY REGISTERED WITH THE SECRETARY OF LABOR FOR THE ACTIVITY THAT THE FARM LABOR CONTRACTOR IS TO BE *HIRED*.

H.R. REP. 97-885, 20 97th Cong., 2d Sess. 16, reprinted in U.S.C.C.A.N. 4547 (Sept. 28, 1982). The House appears to have anticipated that the reasonable steps to verify registration requirement of Section 1842 would require a person hiring the FLC for a specific FLC activity to verify that the FLC is in fact authorized to perform that activity. The legislative history tends to support Valley Garlic's reading.

Next, in interpreting a statutory text, a court should presume that "use of different words is purposeful and evinces an intent [by Congress] to convey a different meaning. *Russello v. United States*, 464 U.S. 16, 23 (1983). Courts do not ascribe variation in choice of language to simple mistakes in draftsmanship. *Russello*, 464 U.S. at 23. The AWPA repeatedly uses the language "use, or caused to be used" or "causing to be used" in describing a less than direct causal relationship between an agricultural employer or FLC seeking workers and those being transported to a worksite. *See* 29 U.S.C. §§ 1802(10)(A)(ii), 1815(2)(b), 1841(b)(1); *see Saintida v. Tyre*, 783 F.Supp. 1368, 1373 (S.D. Fla. 1992) (An agricultural employer "cause[s] the transportation of harvest workers by a [FLC] when this transportation is a 'necessary element in obtaining the workers' to harvest the [agricultural employer's] crop." (citation omitted)) Congress did not repeat the "caused to be used" language in section 1842; instead, it requires reasonable steps be taken to determine that a FLC possesses certification to conduct the activity for which he or she is utilized or hired. The Court must presume that the seemingly more direct and purposeful causal relationship required by Section 1842 is by design.[5]

Finally, the parties discuss *Metzler v. Lykes Pasco, Inc.*, 972 F.Supp. 1438 (S.D. Fla.

---

[5] The Secretary discusses "utilization" of a FLC in the same breath as "causing [a vehicle] to be used" for transportation of workers. Specifically, in arguing that Valley Garlic utilized X-Treme Ag for transportation, he notes that where transportation is a "necessary element in obtaining workers" the grower has "cause[d] the transportation" of those workers. Doc. 27 at 3-4. The Secretary has presented no authority to suggest that "utiliz[ing]" a FLC for a particular FLC activity within the meaning Section 1842 is synonymous with "caus[ing] to be used" a vehicle within the meaning of Section 1841. In fact, the authorities cited involving Sections 1841 and 1842 separately analyze Section 1841's "cause to be used" requirement and Section 1842's "utilize" requirement. *E.g., Metzler v. Lykes Pasco, Inc.*, 972 F.Supp. 1438, 1443 (S.D. Fla. 1997); *Saintida v. Tyre*, 783 F.Supp. 1368, 1373-1374 (S.D. Fla. 1992). To the extent that the Secretary asks this Court to find that Valley Garlic utilized X-Treme Ag for transportation within the meaning of Section 1842 because Valley Garlic caused to be used a vehicle for transportation within the meaning of Section 1841, the Court declines to do so.

1997), and *Howard v. Malcolm*, 852 F.2d 101 (4th Cir. 1988), in depth regarding the reach of any duty imposed by Section 1842. In *Howard*, a farm manager hired a FLC to recruit and oversee a corn harvest. *Howard*, 852 F.3d at 103. The agreement between the FLC and the farm manager specifically required the FLC to transport, house, insure, and pay workers, and to supply a bus to transport the workers. *Howard*, 852 F.2d at 103. The FLC showed the farm manager his FLC certificate indicating that he was permitted to transport and house workers. *Howard*, 852 F.2d at 103. The certificate was limited to housing at a specific location. *Howard*, 852 F.2d at 103. Rather than housing workers at the Secretary-approved location, the FLC housed them elsewhere. *Howard*, 852 F.2d at 103. The *Howard* court found that Section 1842 imposed a requirement on the farm manager to "take reasonable steps to ensure that the contractor is authorized to do the activity in question, he [was] required to verify the specific location" of the workers' housing. *Howard*, 852 F.2d at 106.

In *Metzler*, a citrus grower, harvester, and processor ("the grower")[6] hired FLCs. The grower did not "direct the contractors to recruit, hire or transport migrant farm workers." *Metzler*, 972 F.Supp. at 1439. "Nonetheless, the [FLCs] hire[d] hundreds of [migrant] workers …, many of [whom] are heavily dependent on the contractors for daily transportation" because the grower's worksite was far from public transportation. *Metzler*, 972 F.Supp. at 1439-1440. In recognition of the need for transportation of workers, the grower purchased buses, driven by independent contractors, to transport workers. *Metzler*, 972 F.Supp. at 1440. Before hiring FLCs, the grower required proof (1) of DOL certification to conduct FLC activities like transporting workers, and (2) that FLCs had valid driver's licenses and proper insurance. *Metzler*, 972 F.Supp. at 1440. The grower intended that FLCs transport workers. However, after each FLC was hired, the grower took no further action to confirm that each vehicle was authorized by the DOL or that the drivers maintained driver's licenses and insurance. *Metzler*, 972 F.Supp. at 1440. The Court held that "[u]nder Section 1842 … a person who hires a farm labor contractor

---

[6] In *Metzler*, the Court specifically declined to determine whether the grower was an agricultural employer within the meaning of the AWPA, finding instead that the grower did "not have to be an agricultural employer to incur liability" under Section 1842 for failing to take reasonable steps to ensure that a FLC had a valid certificate to conduct the activity for which it is utilized.

must take reasonable steps to ensure that the contractor has a valid certificate authorizing it to perform the specific jobs for which the contractor is being hired." *Metzler*, 972 F.Supp. at 1442. The *Metzler* court went on to explain that the obligation imposed upon the grower by Section 1842 was to "take reasonable steps to ensure that the contractor is performing only the activity the certificate authorizes"—in that case, "transporting workers in a specific vehicle." *Metzler*, 972 F.Supp. at 1444-1445.

The Secretary suggests that *Metzler* and *Howard* stand for the proposition that Section 1842 imposes a "reasonable steps" requirement on a grower "to take concrete action to ensure the FLC complied with [the AWPA]." Doc. 7 at 18. The Secretary's reading of Section 1842, *Metzler*, *and Howard* is too broad. Section 1842 creates a "reasonable steps" requirement only to verify that the FLC is authorized to perform the specific activity for which it is utilized—meaning hired or contracted. Section 1842 does not, for instance, create an obligation to determine whether a FLC is housing workers if the FLC is not utilized for that purpose.

This Court's reading of Section 1842, *Howard,* and *Metzler*, is supported by *Cardenas v. Benter Farms*, 2000 WL 1372848 (S.D. Ind. Sept. 19, 2000), where the district court addressed the question of whether a grower utilized a FLC when the contract was silent on the issue. In *Cardenas*, the owners of Benter Farms were sued for violation of Section 1842 based on their utilization of a FLC who eventually transported migrant agricultural workers without a certificate from the Secretary authorizing that activity. The farm owners hired a FLC to "recruit, acquire, and supervise workers." *Cardenas*, 2000 WL 1372848 at *1. The farm owners made clear that they would not furnish transportation but did not specify whether the FLC could provide transportation. *Cardenas*, 2000 WL 1372848 at *1 n1. The FLC was properly registered with the Secretary to recruit, solicit, furnish, hire, and employ workers. *Cardenas*, 2000 WL 1372848 at *1. However, the FLC's certificate did not authorize him to transport workers. *Cardenas*, 2000 WL 1372848 at *1, 19. The FLC did transport a family of workers from their Texas home to a hotel in Indiana and then daily from the hotel to the worksite. *Cardenas*, 2000 WL 1372848 at *1-2.That transportation did benefit the farm owners. *Cardenas*, 2000 WL 1372848 at *19. The court held that even though the farm owners hired the FLC, the FLC did transport the workers,

and the farm owners did benefit from the transportation, the utilization question turned on whether the farm owners authorized the FLC to transport the workers. *Cardenas*, 2000 WL 1372848 at *19 ("The question presented here is whether the [farm owners] utilized a specific service provided by [the FLC]—the transportation of the Cardenas Plaintiffs. [¶] The court concludes that the answer to that question depends upon agency principles. The court does not believe that by merely hiring [the FLC] as a farm labor contractor the [farm owners] may be held liable under the AWPA for all of his other activities regardless of whether or not those activities were authorized by the [farm owners]."). In this instance, success on the merits turns on whether Valley Garlic authorized, hired, or contracted X-Treme Ag to transport workers.

It is undisputed that the contract between Valley Garlic and X-Treme Ag expressly prohibited X-Treme Ag from transporting workers to and from the Valley Garlic worksites. However, the Secretary argues, as a matter of practical reality, Valley Garlic utilized the FLC for transportation of workers by X-Treme Ag because it knew that the worksites were "generally far from workers' homes and public transportation." Doc. 27 at 4. The Secretary also places weight on the fact that Valley Garlic had been investigated on seven prior occasions based on suspicions that its FLCs had violated the AWPA. Declaration of Richard Newton, Doc. 7-3 ("Newton Decl.") at ¶ 5. As recently as 2013, Marrione was made aware of one such investigation. Newton Decl. at ¶ 5.[7] In sum, the Secretary argues that despite Valley Garlic's express prohibition on X-Treme Ag transporting workers, it utilized X-Treme Ag knowing that it would transport workers based on the distance of the commute to the Valley Garlic worksites and because Valley Garlic's FLCs had previously unlawfully transported workers. The Secretary has summarized the conduct by Valley Garlic that it offers in support of its argument that Valley Garlic authorized X-Treme

---

[7] Valley Garlic contends that the Secretary's claim that Valley Garlic had been investigated by the DOL for unauthorized transportation is greatly exaggerated. Specifically, Mr. Marrione contends that the "DOL imposed minor assessments on Valley Garlic more than ten years ago for various AWPA violations by FLCs. However, Valley Garlic denied liability … and paid the penalty amounts in the interests of avoiding far more costly litigation…. While DOL did cite Valley Garlic again in 2013, none of the alleged violations were for unauthorized transportation." Declaration of Christian Marrione, Doc. 21 ("Marrione Decl.") at ¶ 9. The Secretary submitted additional evidence in support of its claim that Valley Garlic was on notice of its FLCs having transported workers without authorization. *See* Doc. 27-2. Significantly, the "list of violations" provided to Valley Garlic included "utilizes services of unregistered FLC" but did not list the activity that the FLC was unauthorized to perform. Doc. 27-2 at 8. The lists of violations sent to Valley Garlic's FLCs included unauthorized transportation of workers, but no evidence has been submitted to suggest that Valley Garlic ever received that information. *See* Doc. 27-2.

Ag to transport workers:

- Valley Garlic did not enforce its contractual clause purporting to prohibit worker transportation and did not require its FLCs to train their employees on this "rule," notwithstanding a contractual provision purporting to require such training;

- Valley Garlic did not view vans arriving at the field as a red flag that its FLCs were engaging in unlawful worker transportation;

- Valley Garlic's managers never questioned any fieldworker, FLC crew leader, or anyone else from X-Treme Ag, about how the workers had been transported to the field;

- After the Secretary's investigator informed Defendant Marrione that X-Treme Ag was unlawfully transporting field workers, resulting in the death of four workers, the only action Valley Garlic took was to send X-Treme Ag a one-page letter stating that X-Treme Ag was not allowed to transport workers under its contract with Valley Garlic;

- Marrione met with Defendant Camacho a mere six days after the accident, and said nothing about the accident, the no-transportation "rule," or any concern that X-Treme Ag was engaged in unlawful transportation;

- Six days after the accident, Valley Garlic renewed its contract with Defendant X-Treme Ag, with identical terms; and,

- Valley Garlic took no action against X-Treme Ag or its managers for unlawfully transporting workers.

Doc. 7 at 19. Effectively, the Secretary argues that Valley Garlic hired X-Treme Ag to transport workers and included in the contract a prohibition on transporting workers only as ploy to avoid Section 1842 liability.

Valley Garlic has emphasized that its contract with X-Treme Ag expressly prohibited FLCs from transporting workers. Isabella Camacho testified that she did inform her crew bosses that they were not permitted to transport workers. Camacho Depo. at 94. Valley Garlic further asserted that it and its employees were unaware that workers were being transported by FLCs. Doc. 19 at 11. Because workers often carpooled, the fact that multiple workers arrived in vans did not suggest to Valley Garlic that FLCs were providing transportation. Doc. 19 at 11; Declaration of David Anderson, Doc. 22, ("Anderson Decl.") at ¶ 5. Moreover, Valley Garlic employees typically travelled to multiple fields in any given day and were often only present at each field for a few minutes and only to "ensure that the garlic was harvested properly without

delaying the operation or damaging the crop." Doc. 19 at 12 (citing Anderson Decl. at ¶ 4); Declaration of Elvis Martinez at ¶ 3. The focus of the Valley Garlic employees was on the quality of the crop, not on the vehicles at the margin of the worksites where vehicles were parked. It is not clear that Valley Garlic or its employees contracted, hired, or otherwise authorized X-Treme Ag to transport workers. As a result, the Court cannot now find that Valley Garlic utilized X-Treme Ag to provide transportation.

In this situation, the Court cannot say that the law and facts clearly favor the Secretary. Although serious questions on the merits of the Secretary's Section 1842 claim against Valley Garlic exist, it is not clear to this Court that the Secretary is likely to prevail on the merits of that claim.[8]

**C. Irreparable Injury**

1. X-Treme Ag

The motor vehicle safety requirements of the AWPA require labor contracts or agricultural employers that use or cause to be used any vehicle for transportation of workers to ensure that the vehicle used is safe, that the driver has a valid driver license, and that the vehicle is insured. Allowing a FLC to engage in transportation activity without having satisfied those requirements is dangerous and has to potential to cause loss of life. Additionally, when such an injury takes place, an absence of automobile insurance is likely to make recovery for any injuries much more difficult, if not impossible.

The fact that X-Treme Ag is no longer a certificate-holding FLC does not lessen the likelihood of injury in light of the history of X-Treme Ag or its crew bosses of transporting workers without a certification to do so.

Irreparable injury is likely to result if no injunction is granted.

2. Valley Garlic

The Secretary argues that "Valley Garlic will continue to violate [the transportation provisions of the AWPA] with impunity unless the Court orders it to change its conduct." Doc. 7

---

[8] Because the Secretary has explicitly decided not to seek an injunction based on Section 1841, the Court does not consider whether injunctive relief might be granted under that section based on Valley Garlic having caused its FLCs to transport workers.

at 21. The Secretary may be correct. However, he has not sought to enjoin Valley Garlic from causing vehicles to be used without first causing the vehicle safety requirements to be met. If Valley Garlic continues to violate the AWPA, it will not be because the Court has refused to enjoin the alleged violation of Section 1842. The Court finds that irreparable injury is not likely to result if the court refuses to enjoin the alleged violation of Section 1842.

///

///

**D. Balance of the Hardships and the Public Interest**

1. X-Treme Ag

In light of the fact that X-Treme Ag has no certificate from the secretary to conduct FLC activity, X-Treme Ag will suffer no additional burden if the Court grants the relief sought against it by the Secretary—being enjoined from transporting or directing the transportation of any migrant or seasonal agricultural workers.

The public interest is served by prohibiting X-Treme Ag and its employees from engaging in unlicensed FLC activity, including using unsafe or uninsured vehicles, operated by unlicensed drivers.

2. Valley Garlic

The relief sought by the Secretary against Valley Garlic would appear to require considerable cost to Valley Garlic. The Secretary's proposed injunctive relief regarding the reasonable steps that should be taken to ensure that no FLC working for Valley Garlic transports workers without authorization is extensive. It proposes that Valley Garlic create a written transportation plan with each FLC, including where employees will be recruited from, who will recruit them, how they will get to the worksite, and where vehicles will be parked. The Secretary would also require each worker to check in with Valley Garlic before parking. The Secretary would require recordation of the vehicle, its make, model, year, passenger capacity, license plate number, title, proof of insurance, and driver, as well as a copy of the driver's license. The Secretary would require additional information to be collected from any vehicle carrying three or more persons. That additional information would include the name of each passenger, their

residence address, who arranged the ride, and the amount paid for the ride.

Valley Garlic has submitted evidence tending to indicate that the relief the Secretary seeks "would require a dedicated traffic and parking operation every morning at every field where Valley Garlic has operations, and would require Valley Garlic management to use document scanners in the fields to record copies of documents, which would not be feasible during ongoing agricultural field operation." Anderson Decl. at ¶ 14. "Based on the number of vehicles that arrive at the fields every day, it would take at least two hours at each field where Valley Garlic has operations, to check in every car and record all of the information that the DOL" seeks. Anderson Decl. at ¶ 15. "A two-hour delay at the start of the day would severely disrupt the crucial productivity of Valley Garlic's operations…." Anderson Decl. at ¶ 16.

The Secretary is charged with enforcement of the AWPA. Being unable to enforce the AWPA would place already vulnerable agricultural workers at even higher risk. However, in light of the Court's determination that injunctive relief should be granted against X-Treme Ag (the only FLC alleged in this action to have unlawfully transported workers) and because the Secretary has not sought all of the relief available under the AWPA, the Court is unconvinced that the Secretary will be unable to effectively enforce the AWPA in this instance.

Upon the showing made, the balance of the hardships weighs in favor of Valley Garlic.

Preventing unlicensed and uninsured drivers from operating unsafe vehicles is certainly in the public interest. In this instance, it is not clear that the specific relief that the Secretary seeks is warranted under Section 1842, necessary to serve the public interest, or narrowly drawn to remedy the specific harm alleged. *See Lamb-Weston*, 941 F.2d 970, 974 (9th Cir. 1991) ("Injunctive relief … must be tailored to remedy the specific harm alleged"); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990). Based on the evidence and briefing before the Court, it is not clear that the requested injunctive relief will serve the public interest.

**E. Conclusion**

The Secretary has established that injunctive relief is warranted against X-Treme Ag based on its violation of Section 1811(a). The relief the Secretary seeks is tailored to preventing the harm that Section 1811(a) seeks to prevent. The Secretary's motion for preliminary

injunction will be granted as to X-Treme Ag.

The Secretary has not established that injunctive relief is warranted against Valley Garlic based on its alleged violation of Section 1842. The Secretary's motion for preliminary injunction will be denied without prejudice as to Valley Garlic.

///

///

///

## V. ORDER

Based on the foregoing, the Secretary's motion for preliminary injunction will be GRANTED IN PART and DENIED IN PART as follows:

1. X-Treme Ag, Isabella Camacho, Ofelia Ramirez Morales and Cesar Neri are enjoined:
    a. from transporting, or directing the transportation of, migrant or seasonal agricultural workers; and
    b. from hiring, using, or employing any person to transport migrant or seasonal agricultural workers without a proper certificate of registration from the Department of Labor.
2. The Secretary's Motion to enjoin conduct by Valley Garlic is DENIED without prejudice.

IT IS SO ORDERED.

Dated:   October 18, 2016                                    _____
                                                                            SENIOR  DISTRICT  JUDGE