1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS E. PEREZ, Secretary of Labor, United States Department of Labor<br><br>Plaintiff,<br><br>v.<br><br>VALLEY GARLIC, INC., dba SEQUOIA PACKING CO., a California Corporation; CHRISTIAN BARRERE MARRIONE, an individual; DAVID CLARK ANDERSON, an individual; X-TREME AG LABOR, INC., a California corporation; ISABELLA ALVAREZ CAMACHO, an individual; OFELIA RAMIREZ MORALES, an individual; and CESAR NERI, an individual,<br><br>Defendants. | CASE NO. 1:16-CV-01156-AWI-EPG<br><br>**ORDER DENYING PLAINTIFF'S SECOND MOTION FOR PRELIMINARY INJUNCTION**<br><br>**(Doc. 34)** |

### I. Introduction

Plaintiff Thomas E. Perez is the United States Secretary of Labor ("the Secretary"). The Secretary is charged with enforcing the Fair Labor Standards Act of 1938 ("FLSA") and the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"). This action proceeds on the Secretary's FLSA and AWPA claims against Valley Garlic Inc. ("Valley Garlic"),[1] a garlic

---

[1] When the Court refers to arguments by "Valley Garlic," those arguments are also the position of Valley Garlic's named employees—Christian Barrere Marrione and David Clark Anderson.

processing and packing plant, X-Treme Ag Labor Inc. ("X-Treme Ag"), a farm labor contractor, and several of their respective managerial and supervisory employees.

On August 8, 2016, The Secretary filed a motion for preliminary injunction, seeking (among other things) to enjoin Valley Garlic from utilizing farm labor contractors ("FLCs") to provide transportation of migrant and seasonal agricultural workers when those FLCs do not possess certificates of registration to transport authorizing them to do so, in violation of 29 U.S.C. § 1842 ("Section 1842"). *See* Doc. 7. The Court denied the motion as to Valley Garlic without prejudice, explaining that the Secretary did not make a clear showing that Valley Garlic "utilized" X-Treme Ag or any other FLC to provide transportation within the meaning of Section 1842 or that irreparable harm was likely to result if the Court refused to enjoin violation of Section 1842. Doc. 29 at 8-17.

The Secretary now moves for a preliminary injunction, enjoining Valley Garlic from causing vehicles to be used to transport migrant and seasonal agricultural workers without ensuring the vehicle safety requirements of 29 U.S.C. § 1841 ("Section 1841") are met. Doc. 34. Valley Garlic responds that it is not subject to the requirements of Section 1841 because it is not an agricultural employer and has not caused any vehicles to be used. Doc. 37. It further contends that the Secretary has also otherwise failed to establish entitlement to preliminary injunctive relief because he cannot show irreparable injury, that the balance of equities tips in his favor, or that the injunction is in the public interest. Doc. 37.

For the following reasons, the Secretary's motion will be denied.

## II. Background

This Court set forth a statement of the factual background of this action in its October 19, 2016 order. Doc. 29 at 2-5. That statement is incorporated by reference. The Secretary's prior motion for preliminary injunction (and correspondingly the Court's background statement) focused largely on the automobile accident resulting from a field worker (recruited by X-Treme Ag pursuant to a contract with Valley Garlic) driving without a driver license, who fell asleep at the wheel while transporting seven other employees during the return trip from one of Valley Garlic's Gilroy, California worksites to the workers' homes in Merced, California. Docs. 7, 29.

1   X-Treme Ag had a certificate of registration permitting recruitment of agricultural workers but

2   that certificate did not permit transportation of such workers. *See* Doc. 7-3 at 5-6. Although the

3   Secretary's present motion discusses the accident, it takes a broader approach, commenting on

4   the scope and locations of Valley Garlic's operations in California and Oregon, Valley Garlic's

5   hiring practices and requirements for FLCs, Valley Garlic's supervision of the workers recruited

6   by FLCs, and the communities from which those FLCs are recruited.

7          Valley Garlic uses approximately 2,000 acres of land to grow garlic in California.

8   Deposition of David Anderson ("Anderson Depo.") at 44:2-7.[2] Those 2,000 acres fall within

9   seven cities spread through five counties. Deposition of Elvis Martinez ("Martinez Depo.") at

10  19:13-19:23; 20:2-21:17. Many of those cities have multiple fields where Valley Garlic grows

11  and harvests garlic. *See* Martinez Depo. at 20:2-21:17. Valley Garlic relies on FLCs to provide

12  its farm labor to complete planting, cultivation, and harvesting of the garlic. Anderson Depo. at

13  131:4-132:18; Deposition of Christian Marrione ("Marrione Depo.") at 41:12-42:12. In 2015,

14  Valley Garlic engaged at least four different FLCs. Anderson Depo. at 109:24-110:14. Valley

15  Garlic decides when each process should be undertaken, where it should be undertaken, and how

16  many workers are necessary; Valley Garlic then contacts the FLC, indicating the work to be

17  done.  Anderson Depo. at 60:16-19, 74:24-75:3, 77:6-79:11. During the planting, undercutting,[3]

18  windrowing,[4] and clipping processes, at least one Valley Garlic employee is present at all times

19  to ensure the quality of the work done by the workers recruited by the FLCs. Anderson Depo. at

20  72:12-15, 82:1-5, 93:3-14, 101:18-20, 114:4-12. During those processes, the Valley Garlic

21  employees communicate to the workers primarily through the FLC or the FLC's supervisors;

22  Valley Garlic employees do not directly communicate with the workers or foremen. Anderson

23  Depo. at 86:19-87:17, 104:18-105:8, 119:14-21. Valley Garlic sets the duration of time worked

24

25  [2] Valley Garlic contracts independent growers to grow garlic. Anderson Depo. at 44:8-11, 45:2-6. Those growers
    provide the land upon which the garlic is grown, lay the groundwork for planting, provide the water and irrigate, and
26  provide the manpower to apply necessary chemicals. Anderson Depo. at 44:16-23.  The location where garlic is
    grown changes from year to year. *See* Martinez Depo at 34:18-21.
27  [3] Undercutting is the process of using a tractor and tractor implement to cut underneath the garlic bulbs so they can
    be easily pulled from the ground. *See* Anderson Depo. at 80:7-81:8.
28  [4] Windrowing is the process of positioning the undercut garlic in a trench or furrow so that the tops of the garlic
    cover the bulbs in a way that will allow the garlic to dry and avoid sun damaged. Anderson Depo. at 94:6-95:7.

by workers but acreage of land covered depends on the number of workers recruited by FLCs. *See* Anderson Depo at 91:21-92:1, 109:2-15, 122:21-123:2. Valley Garlic keeps daily records of the number of workers that FLCs provide and the number of hours that each of those workers works per day. Anderson Depo. at 153:12-154:6.

It is undisputed that Valley Garlic has never engaged a FLC that possessed a certification of registration from the Secretary authorizing it to transport workers. Doc. 34 at 10 citing Doc. 7-3 at Exh.1. Valley Garlic has never hired an FLC with direction to provide transportation, Anderson Depo. at 136:25-137:1, and all of its FLC contracts prohibit the FLC from providing transportation to workers without the express consent of Valley Garlic, *See, e.g.*, Doc. 24-1 at 16. Valley Garlic has never consented to a FLC providing transportation to workers. Anderson Depo. at 137:13-14.

Valley Garlic expects that each of its workers will drive their personal vehicles to the Valley Garlic worksites. Anderson Depo. at 137:23-138:2, 155:22-23. In some situations, Valley Garlic reimburses those persons (potentially workers, crew bosses, or FLCs) who drive long distances to the worksite. *See* Martinez Depo. at 47:7-49:22. However, Valley Garlic does not monitor whether FLCs provide transportation to workers, Marrione Depo. at 127:15-18; Anderson Depo. at 155:24-156:10; Martinez Depo. at 65:17-66:15, or where the workers are recruited from, Anderson Depo. at 155:3-5. In fact, even after the auto accident giving rise to this action occurred, and Valley Garlic was informed that FLCs or crew bosses transported workers, Marrione Depo. at 116:12-14, Valley Garlic did nothing to monitor whether its FLCs provide transportation to workers to and from Valley Garlic's worksites. *See* Anderson Depo. at 162:19-21, 164:1-165:5; Marrione Depo. at 63:2-18. Instead, Valley Garlic sent a letter to X-Treme Ag indicating that X-Treme Ag was "not authorized to transport any workers who provide services under" the agreement between Valley Garlic and X-Treme Ag. Doc. 7-2 at 105. The letter continued, "the [DOL] investigator indicated the possibility that your supervisor or foreman was coordinating transportation. This is not allowed under [the] agreement and must stop immediately." Doc. 7-2 at 105.

Valley Garlic did not immediately terminate its contract with X-Treme Ag. Compl. at ¶

1   19. Valley Garlic no longer uses X-Treme Ag as a FLC and X-Treme Ag no longer possesses a

2   certificate of registration from the Secretary permitting FLC activity.

3                                    **III. Legal Standard**

4          Federal Rule of Civil Procedure 65(a) governs requests for preliminary injunctions.  "A

5   plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits,

6   that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

7   equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural*

8   *Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  "A preliminary injunction is an

9   extraordinary remedy never awarded as of right.  In each case, courts 'must balance the

10  competing claims of injury and must consider the effect on each party of the granting or

11  withholding of the requested relief.'  'In exercising their sound discretion, courts of equity

12  should pay particular regard for the public consequences in employing the extraordinary remedy

13  of injunction.'"  *Winter*, 555 U.S. at 24 (internal citations omitted); *see Lopez v. Brewer*, 680 F.3d

14  1068, 1072 (9th Cir.2012) (A preliminary injunction is a "drastic remedy that should not be

15  granted unless the movant, by a clear showing, carries the burden of persuasion.")  The Ninth

16  Circuit has adopted a "serious questions" approach to preliminary injunctions under which an

17  injunction may issue if there are "serious questions going to the merits"—rather than likelihood

18  of success on the merits—so long as the "balance of hardships that tips sharply towards the

19  plaintiff …, [and] plaintiff also shows there is a likelihood of irreparable injury and the

20  injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

21  1135 (9th Cir. 2011) (citing *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810,

22  813 (9th Cir. 2000)).

23         Generally, when courts grant preliminary injunctions they prohibit a defendant from

24  taking action, "the purpose … [of which] is merely to preserve the relative positions of the

25  parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch, 451 U.S. 390, 395*

26  *(1981); Arizona Dream Act Coal. V. Brewer,* 757 F.3d 1053, 1060 (9th Cir. 2014). A district

27  court has the authority to issue a mandatory injunction that goes beyond maintaining the status

28  quo and orders a responsive party to take action, *Marlyn Nutraceuticals, Inc. v. Mucos Phara*

1  *GmbH & Co.*, 571 F.3d 874, 879 (9th Cir. 2009); *Coltharp v. Herrera*, 584 Fed.App'x. 334, 336

2  (9th Cir. 2014), however, such relief is "particularly disfavored" and should be denied "unless

3  the facts and law clearly favor the moving party," *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir.

4  2015) (en banc) (citation and internal quotation marks omitted). "In plain terms, mandatory

5  injunctions should not issue in doubtful cases." *Garcia*, 786 F.3d at 740 (citation and internal

6  quotation marks omitted).

7  **IV. Discussion**

8  **A. Likelihood of Success on the Merits**

9       Section 1841 imposes obligations upon an agricultural employer if it "us[es], or caus[es]

10  to be used, any vehicle for transportation" of migrant or seasonal agricultural workers. It requires

11  that the agricultural employer: (1) "ensure that" the vehicle used "conforms to the standards

12  proscribed by the Secretary" as "necessary to protect the health and safety of migrant and

13  seasonal agricultural workers"; (2) "ensure that each driver has a valid and appropriate" driver

14  license; and (3) "have an insurance policy or liability bond that … insures the agricultural

15  employer … against liability for damage to persons or property arising from … the causing to be

16  operated … of any vehicle used to transport any migrant or seasonal agricultural worker." 29

17  U.S.C. § 1841(b).

18       The Secretary argues that Valley Garlic (1) is an agricultural employer subject to the

19  requirements of Section 1841, (2) caused to be used vehicles for transporting seasonal or migrant

20  agricultural workers, and (3) failed to ensure the safety of the vehicles used and the driver license

21  status of the drivers. Doc. 34 at 16. Valley Garlic disagrees as to the first two items; it argues that

22  no obligation attached to it to ensure the safety of the vehicles or the licensing of the drivers

23  because it (1) was not an "agricultural employer" of the FLCs' employees and (2) did not cause

24  vehicles to be used for transporting seasonal or migrant agricultural workers. Doc. 37 at 11.

25  Valley Garlic does not dispute that it did not verify the safety of the vehicles used or the driver

26  license status of the drivers.

27  1. Valley Garlic is an agricultural employer

28       An "agricultural employer" is "any person who [(1)] owns or operates a farm, ranch, [or]

processing establishment," et cetera … and (2) "recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(2).

a. Valley Garlic operates garlic farms.

The Secretary argues that Valley Garlic meets the owner/operator component of the agricultural employer definition because it "[1] operates a farm and [2] owns and operates a garlic processing and packing facility." Doc. 34 at 16. Valley Garlic does not dispute that it "is … in the business of growing and selling garlic." Doc. 37 at 11.[5] Valley Garlic's garlic planting, growing, and harvesting qualify as operation of a farm for purposes of 29 U.S.C. § 1802(2).

b. Valley Garlic does employ the fieldworkers recruited by FLCs.

The parties' larger dispute is whether Valley Garlic exercised sufficient control over the workers recruited by X-Treme Ag to be considered their employer for purposes of Section 1802(2). The Secretary contends that Valley Garlic satisfies the second requisite to be an agricultural employer because: (1) "as a matter of economic reality, Valley Garlic employs the fieldworkers its FLCs recruit and hire" because those workers are "economically dependent" on Valley Garlic, and (2) Valley Garlic solicits migrant and seasonal workers by hiring FLCs to recruit its workforce. Doc. 34 at 17, 24.

Valley Garlic agrees that the economic realities test applies to determine whether it employs the fieldworkers but argues that it does not exercise sufficient control to qualify as an employer under that rule. Doc. 37 at 11-17. It further contests that the Secretary's formulation of "solicitation" is incorrect because, as framed, it would swallow the remainder of Section 1802(2). Doc 37 at 18.

The AWPA is explicit that "employ," within the meaning of the AWPA, has the same meaning given to the term by the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 1802(5) (citing 29 U.S.C. § 203(g)). To "employ" includes "to suffer or permit to work." 29 U.S.C. § 203(g). Congress purposely defined "employ" expansively in the FLSA to "stretch the meaning

---

[5] However, this Court would note that the Secretary has not directed the Court to any evidence tending to indicate that Valley Garlic hires or employs migrant or seasonal agricultural workers in its processing (as opposed to its planting and hiring) operations. Moreover, Valley Garlic's operation of processing and packing operations appear unrelated to the Secretary's transportation claims.

of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992); *Rutherford Food. Corp. v. McComb*, 331 U.S. 722 (1947); *see Tony & Susan Alamo Found. V. Sec'y of Labor*, 471 U.S. 290, 295 (1985) (explaining that the definition of employ is "exceedingly broad.") As a threshold matter, the parties appear to agree that the FLCs that Valley Garlic hired were all independent contractors rather than employees of Valley Garlic. The Secretary has presented no argument that Valley Garlic employs the field workers because the FLCs are employees of Valley Garlic. *See* 29 C.F.R. § 500.20(h)(4) ("If it is determined that the farm labor contractor is an employee of the agricultural employer/association, the agricultural workers in the farm labor contractor's crew are deemed to be employees of the agricultural employee/association ....") Instead, the Secretary relies on a joint employment theory.

Under the FLSA and the AWPA, a worker may be employed by more than one employer. *See* 29 C.F.R. § 500.20(h)(5) ("The definition of the term employ includes the joint employment principles applicable under the Fair Labor Standards Act.") For instance, the AWPA regulations specifically consider the situation "where an agricultural employer … asserts that the agricultural workers in question are the sole employees of an independent contractor [FLC]…. [Such a situation] does not as a matter of law negate the possibility that an agricultural employer may be a joint employer … of the harvest workers." 29 C.F.R. § 500.20(h)(5)(ii) (citing *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235 (5th Cir. 1973)); *see also* 29 C.F.R. 791.2 (explaining that joint employment under the FLSA can exist "[w]here one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee.") Whether an agricultural employer[6] is a joint employer of a worker recruited by an FLC is determined based on the "economic reality" of the situation—"whether the worker is so

---

[6] The Section 500.20 of Title 29 of the Code of Federal Regulations appears to use the term "agricultural employer" more loosely than does Section 1802(2). *Compare* 29 C.F.R. § 500.20(h)(4-5) *with* 29 U.S.C. 1802(2). Section 500.20 seems use the term "agricultural employer" as a shorthand for putative agricultural employer in defining what it means for a person to "employ" for purposes of Section 1802(2). For purposes of clarity, a farmer, grower, rancher, etc. is not an "agricultural employer" unless and until it recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker. 29 U.S.C. § 1802(2). However, for purposes of consistency with the Code of Federal Regulations, the Court now uses the shorthand "agricultural employer" to refer to growers, ranchers, farmers, etc. regardless of whether a determination has been made that the entity "employs" a migrant or seasonal agricultural employee.

economically dependent on the agricultural employer as to be considered its employee." 29

C.F.R. §500.20(h)(5)(iii); *see Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 33 (1961). The

regulations set out a non-exhaustive list of factors "to be used in determining the ultimate

question of economic dependency." 29 C.F.R. § 500.20(h)(5)(iv); *see Torres-Lopez v. May*, 111

F.3d 633, 639-640 (9th Cir. 1997). The factors are as follows:

> (A) Whether the agricultural employer/association has the power, either alone or through control of the farm labor contractor to direct, control, or supervise the worker(s) or the work performed (such control may be either direct or indirect, taking into account the nature of the work performed and a reasonable degree of contract performance oversight and coordination with third parties);
>
> (B) Whether the agricultural employer/association has the power, either alone or in addition to another employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the worker(s);
>
> (C) The degree of permanency and duration of the relationship of the parties, in the context of the agricultural activity at issue;
>
> (D) The extent to which the services rendered by the worker(s) are repetitive, rote tasks requiring skills which are acquired with relatively little training;
>
> (E) Whether the activities performed by the worker(s) are an integral part of the overall business operation of the agricultural employer/association;
>
> (F) Whether the work is performed on the agricultural employer/association's premises, rather than on premises owned or controlled by another business entity; and
>
> (G) Whether the agricultural employer/association undertakes responsibilities in relation to the worker(s) which are commonly performed by employers, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment).

29 C.F.R. § 500.20(h)(5)(A-G). In addition to the above-listed regulatory factors, the Ninth

Circuit in *Torres-Lopez v. May*, 111 F.3d at 640 articulated additional factors that courts may

consider in determining whether a joint employment relationship exists:

> (1) whether the work was a "specialty job on the production line,"

(2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without "material changes,"

(3) whether the "premises and equipment" of the employer are used for the work,

(4) whether the employees had a "business organization that could or did shift as a unit from one [worksite] to another,"

(5) whether the work was "piecework" and not work that required "initiative, judgment or foresight," [and]

(6) whether the employee had an "opportunity for profit or loss depending upon [the alleged employee's] managerial skill[.]"

*Torres-Lopez*, 111 F.3d at 640 (internal citation omitted).[7] These factors guide the Court's determination of whether, as a matter of economic reality, Valley Garlic employed the workers recruited by X-Treme Ag and the other FLCs. However, "[n]either the presence or absence of any individual factor is determinative." *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981). The parties agree that the factors guide the Court's inquiry; the parties disagree about the application of those factors.

**Regulatory Factor (A)** – Power to control workers or work performed.

Valley Garlic's contract with X-Treme Ag explicitly notes that "persons hired by [X-Treme Ag] shall be employees of [X-Treme Ag] and not employees of [Valley Garlic]…. [X-Treme Ag] shall have sole and exclusive control, direction, and supervision of such persons with repect to its employment of them…." Doc. 24-1 at 9. However, during planting, undercutting, windrowing, and clipping, at least one Valley Garlic employee is present to ensure the quality of the work by the fieldworkers. Anderson Depo. at 72:12-15, 82:1-5, 93:3-14, 101:18-20, 114:4-12. Valley Garlic contends that its "quality control employees have no direct control over the FLC workers." Doc. 37 at 12. Rather, Valley Garlic conveys the required method of the work to be performed to the FLC prior to beginning the job, "and the FLC then instructs its workers." *Id*. When a worker completes work to a standard not acceptable to the

---

[7] As the Secretary correctly noted, *Torres-Lopez* articulated eight "non-regulatory" factors before the 1997 amendments to the AWPA regulations took effect. The final two regulations—permanence in the working relationship and whether the service rendered was integral to the employer's business—added as regulatory considerations. *See* 29 C.F.R. § 500.20(h)(5)(C) and (h)(5)(E).

1  Valley Garlic quality control employee, that employee will communicate with the FLC or the

2  fieldworker supervisor to correct the problem. *See, e.g.,* Anderson Depo. at 84:23-87:17.

3        Valley Garlic also notes that its quality control employees have no authority to "hire, fire,

4  or discipline" fieldworkers, Valley Garlic itself has no authority to control the attendance of the

5  fieldworkers, and the fieldworkers often only work for Valley Garlic for a few days. Doc. 37 at

6  12-13. Although those considerations are relevant for factors (B) and (C)—power to set

7  employment terms and duration of employment relationship—they do not weigh on whether

8  Valley Garlic controlled the work performed.

9        Whether Valley Garlic directs the workers directly, by speaking to the workers, or

10  indirectly, through the FLC or supervisor, is of no significance for this consideration. This factor

11  considers the amount of control Valley Garlic has over the processes completed: does it provide

12  oversight and direction on how to carry out the job or simply point the workers (or FLC) in the

13  direction of the field and instruct on the job generally? Does it control the dates, times, and

14  locations for work to be accomplished or does it simply instruct the FLC on the agricultural

15  specifications of the job? *See Torres-Lopez*, 111 F.3d at 642-643; *Arredondo v. Delano Farms

16  Co.*, 922 F.Supp.2d 1071, 1076 (E.D. Cal. 2013) (citing *Martinez-Mendoza v. Champion Intern.

17  Corp*, 340 F.3d 1200, 1211 (11th Cir. 2003)) (drawing a distinction between power to control

18  workers by controlling the harvest schedule, number of workers present, and overseeing the

19  quality of the work to be done, versus an absence of power to control workers where the grower

20  only drafted the planting specifications and allowed the FLC to direct planting); *Rosales v. El

21  Rancho Farms*, 2011 WL 6153276 (E.D. Cal. Dec. 12, 2011) (FLC deciding start time, breaks,

22  and end times weighed against a finding that the farmer was a joint employer); *see also Charles

23  v. Burton*, 169 F.3d 1322, 1330 (11th Cir. 1999).

24        Valley Garlic set the schedule for all planting, growing, and harvesting activity.

25  Anderson Depo. at 60:16-19, 74:24-75:3, 77:6-79:11, 92:13-15. Valley Garlic also directed the

26  FLCs regarding the number of workers necessary. *See* Deposition of Isabella Camacho

27  ("Camacho Depo.") at 49:1-12. During the planting, undercutting, windrowing, and clipping

28  processes, at least one Valley Garlic employee was present at all times to ensure the quality of

the work done by the workers recruited by the FLCs. Anderson Depo. at 72:12-15, 82:1-5, 93:3-14, 101:18-20, 114:4-12. When that Valley Garlic employee detected a problem with the work being conducted, he explained the issue to the FLC or supervisor, told the FLC or supervisor to fix it, and that message was communicated down the chain. Anderson Depo. at 85:6-86:3, 111:18-112:5. There is no suggestion that the FLCs or workers had an option to reject Valley Garlic's direction. Valley Garlic controlled the work being conducted, albeit indirectly, in a manner that weighs in favor of a finding that it was a joint employer of the workers. *See Torres-Lopez*, 111 F.3d at 643 (quoting *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235, 238 (5th Cir. 1973) ("The fact that [the grower] effected the supervision by speaking to the crew leaders, who in turn spoke to the harvest workers, rather than speaking directly to the harvest workers does not negate a degree of apparent on-the-job control over the harvest workers.")).

**Regulatory Factor (B)** – Power to set employment conditions or pay rates for workers.

It is undisputed that Valley Garlic has no ability to hire or fire any individual field worker. Second Declaration of David Anderson, Doc. 37-1 ("Anderson Decl. 2") at ¶ 17. That portion of this factor tends to weigh against a joint employer relationship.

Also relevant for this factor, the Secretary contends that Valley Garlic "set[s] all of the workers' pay rates—both hourly and by the piece—through the season through its contracts with X-Treme Ag." Doc. 34 at 21 (citing Marrione Statement at 96:3-7; Anderson Statement at 127:10-13, 129:14-24); *see* Camacho Depo. at 51:12-52:5, 81:10-19. Valley Garlic explains that it sets a "bin-rate that Valley Garlic pays to the FLC" based on the number of buckets necessary to fill a bin. Doc. 37 at 14 (citing Anderson Decl. 2 at ¶ 12). The FLC then typically pays its employees at a piece-rate based on the number of buckets filled. *Id*. Valley Garlic occasionally changes the bin-rate to meet market demands and stay competitive with other agricultural employers. *Id*. In essence, Valley Garlic argues because it pays FLCs per-bin but FLCs pay the field workers per-bucket that it does not control the amount that the filed workers are paid.

What Valley Garlic does not mention is that it pays FLCs at a rate separate from the rates paid to fieldworkers. *See* Doc. 24-1 at 30-39. Valley Garlic negotiates (or sets) field worker rates directly with FLCs for the exact payment amounts that FLCs will pass on to field workers. *See,*

*e.g.*, Anderson Depo. at 129:14-24 (explaining that  Valley Garlic sets a piece rate at 108 buckets per bin at $2.25 per bucket). For instance, at various points in the 2015-2016 season, Valley Garlic set for X-Treme Ag recruited workers: hourly rates for tractor driving, undercutting, windrowing and clipping, daily rates for crew foremen, and piece rates (per-acre or per-bin) for clipping and other harvesting activity. Doc. 24-1 at 30-39; *see* Camacho Depo. at 35:25-36:14. Separate from those payment amounts, X-Treme Ag was consistently paid a 36% commission of the gross payroll amount. *Id.*; *see* Camacho Depo. at 35:18-24.

Valley Garlic also fails to mention that it occasionally pays bonuses to the field workers recruited by FLCs to incentivize those employees to continue to work with Valley Garlic. Anderson Depo. at 144:24-145:16.

In *Torres-Lopez*, the district court, in determining that the grower did not have control over payment of workers, noted that compensation increases by the grower to the FLC did not result in higher wages to the field workers. *Torres-Lopez*, 111 F.3d at 643. The same is not true here; Valley Garlic's own declarations make clear that the higher bin-rates that FLCs negotiate with Valley Garlic are to "increase the piece-rate that [FLCs] pay[] to the laborers in order to remain competitive." Anderson Decl. 2 at ¶ 12; *see Arredondo*, 922 F.Supp.2d at 1085-1086 (finding that grower had at least some say over worker pay when it negotiated pay rates and compensated FLC with a commission set as a percentage of overall wages paid to its workers). The Ninth Circuit explained that increasing compensation to a FLC "to allow farmworkers to draw higher wages" shows that a grower "exercise[s] some power in determining the pay rates for farmworkers." *Torres-Lopez*, 111 F.3d at 643.  That level of involvement in setting compensation for field workers in this case exceeds the level of involvement in *Torres-Lopez*. That level of involvement in setting compensation weighs in favor of finding a joint employer relationship.

**Regulatory Factor (C)** – Duration and permanency of the employment relationship.

The Secretary presents little to suggest that Valley Garlic actually had long-term employment relationships with any of its field workers. Rather, he makes two observations. First, Valley Garlic paid bonuses to employees who performed undercutting and planting tasks to

encourage a longer working relationship "'because those people are real important' to [Valley Garlic's] successful harvest." Doc. 34 at 21 (quoting Anderson Depo. at 144:24-145:16). Second, in *Torres-Lopez*, the employees also had relatively brief—thirty-two days—working relationship with the grower that did not prevent a finding of joint employment. *See Torres-Lopez*, 111 F.3d at 644.

Valley Garlic emphasizes the high degree of flexibility that field workers have in selecting an agricultural employer to work for and the hours to work for each. Doc. 37 at 14. Valley Garlic explains that it is "not uncommon for laborers … to work for only one or two days and then leave to work on a competitor's operation, or in a completely different commodity…." *Id*. (citing Anderson Decl. 2 at ¶ 8.) Occasionally those workers will "return during the same season, but not always." *Id*.

This factor does not support a finding that a joint employment relationship existed.

**Regulatory Factor (D)** – Level of training required.

The Eleventh Circuit has explained that this factor is a rough measure of economic dependence because "the lower the worker's skill level, the lower the value and marketability of his services, and the greater the likelihood of his economic dependence on the person utilizing those services." *Martinez-Mendoza*, 340 F.3d at 1212-1213 (citing Migrant and Seasonal Agricultural Worker Protection Act, 62 Fed. Reg. at 11,740-41).

Before the field workers begin any planting or harvesting activity Valley Garlic instructs FLC supervisors on the proper procedure for the task conducted. Anderson Depo. at 105:7-16; First Declaration of David Anderson, Doc. 22 ("Anderson Decl. 1") at ¶ 5. Thereafter, those supervisors instruct the field workers on that procedure. *Id*. The instruction on the procedure takes approximately ten minutes but mastery by a field worker may talk half of a day. Anderson Depo. at 105:17-19. As Valley Garlic has explained, some of the methods of harvesting that it employs are different than those used by some other growers. Anderson Depo. at 118:19-119:1.

The tasks are rote and repetitive, requiring little training and affording little marketability. *See Arredondo*, 922 F.Supp.2d at 1086 (Work was "repetitive" and "rote," thus weighing in favor of finding a joint employment relationship, where "workers learned the techniques required

… in fifteen to thirty minutes and often mastered the techniques within a matter of days.") This factor weighs in favor of a finding that Valley Garlic is a joint employer of the workers.[8]

**Regulatory Factor (E)** – Integral nature of the work conducted by fieldworkers.

The parties agree that the work conducted by the fieldworkers is integral to Valley Garlic's operation. Doc. 34 at 22. Doc. 37 at 15. This factor weighs in favor of finding that Valley Garlic was a joint employer of the workers.

**Regulatory Factor (F) –** Location of the work conducted.

The parties highlight the two of the justifications for consideration of this factor in determining whether a worker is economically dependent on the putative agricultural employer: first, "without the land, the worker might not have work"; second, "a business that owns or controls a worksite will likely be able to prevent labor violations." *Torres-Lopez*, 111 F.3d at 641; *see* Doc. 37 at 15-16; Doc. 34 at 22.

Valley Garlic does not own the land upon which it grows garlic. Anderson Depo. at 43:1-44:15. It contracts with landowners (referred to as "growers") "to provide the seed[,] to plant the garlic, [to] watch over it during the year, and then [to] harvest it." Anderson Depo. at 44:12-15. The growers "provide the land," "all the groundwork before" planting, "all the water," and all the people to apply the herbicides [and] fungicides." In total, Valley Garlic grows approximately 2,000 acres of garlic in California per year on that land. Valley Garlic contracts for "the right to enter upon the property in which the [g]arlic is grown to inspect, sample and harvest the [g]arlic" upon "reasonable prior notice." Doc. 37-1 at 7-8 (described by Valley Garlic as the "typical contract that Valley Garlic enters into with landowners.")

Valley Garlic contends that it "merely contracts for limited use of the land to grow and harvest garlic [and] enters the land with the permission from the land owner only to inspect crop

---

[8] Valley Garlic argues that the field workers are mobile because they take their skills and go to other operations. Doc. 37 at 15 (citing Anderson Decl. at ¶¶ 8, 14). Essentially, Valley Garlic argues that this factor is not a good indicator of economic reality. The Court is unpersuaded and otherwise bound by precedent. *See Torres-Lopez*, 111 F.3d at 644; *Real v. Driscoll Strawberry Associates, Inc*, 603 F.2d 748, 756 (1979) ("[S]ervices performed by the [workers] consist primarily of physical labor, requiring no special technical knowledge or skill," tending to indicate an employment relationship.)

Moreover, the Court has already considered the duration of field worker employment with Valley Garlic. To the extent that Valley Garlic is correct that their workers are mobile, that mobility is acconted for in considering the duration of their employment with Valley garlic.

and field conditions … after giving reasonable notice to the landowner." Doc. 37 at 16. As a result, it argues, its access to the land does not afford "any appreciable degree of control over the workers' ability to work." *Id.*  Valley Garlic is limited in the purposes for which it can enter the growers' lands. *But see*, Anderson Depo. at 77:12-23 ("Q. [Y]ou have the right to go to the field pretty much any time you want to? A. Yes.") That said, those purposes for or uses of the land— planting and harvesting—are why the workers were on the land. The growers that Valley Garlic contracted with exerted no control over the land while Valley Garlic, its FLCs, and the workers planted and harvested garlic. *See* Anderson Depo at 44:12-23 (Valley Garlic "provide[s] the seed to plant the garlic, watch over it during the year, and then harvest it." "The growers provide the irrigation…." Valley Garlic then "cut[s] the water … [a]nd … takes it from there." Valley Garlic harvests.)  For purposes of the workers at issue in this action, Valley Garlic controlled the land. *See Torres-Lopez*, 111F.3d at 643 (finding that, relative to the FLC and workers who had no ownership interest in the land, the agricultural employer "had an ownership interest" in the land for purposes of this consideration even though it only leased the land).

**Regulatory Factor (G)** – Responsibilities to workers undertaken by Valley Garlic.

Valley Garlic did not prepare payroll records, or prepare or issue checks for payment of worker wages. Valley Garlic did, however, pay bonuses to workers involved in more specialized activities and on occasion reimbursed for gasoline used to commute long distances to the worksite. *See* Martiez Depo. at 47:7-48:6; Anderson Depo. at 144:24-10, 150:11-151:16. Valley Garlic also provided all tools and machinery (clippers, harvesting bins, tractors, forklifts, undercutting attachments, planters) for workers to use with the exception of gloves and buckets. Anderson Depo. at 56:5-9, 73:23-25, 96:1-6 113:18-21; Martinez Depo. at 50:1-15; Marrione Depo. at 107:18-19, 108:11-13.[9] The record contains no indication of where the gloves used by workers came from. FLCs provided standard five-gallon buckets. Anderson Depo. at 113:18-114:1. Valley Garlic did not provide restrooms or water—FLCs did. Camacho Depo. at 61:22-62:1, 88:20-89:3.

---

[9] Valley Garlic does not own all of the tractors and forklifts that it uses in garlic harvesting. Sometimes it rents tractors and forklifts. Anderson Depo. at 81:13-15; Marrione Depo. at 107:20-23, 108:7-10.

Valley Garlic did undertake some responsibilities in relation to the workers that would be expected of an employer. However, those responsibilities appear to be limited relative to the FLCs' undertakings. This factor does not weigh strongly in favor of finding an employment relationship between Valley Garlic and the field workers.

**Non-Regulatory Factor (1)** – Specialty job on a production line.

In *Torres-Lopez*, the Ninth Circuit described the process of picking cucumbers as "one small step in the sequence of steps" by the agricultural employer "to grow cucumbers and prepare them for processing." *Torres-Lopez*, 111 F.3d at 643. The workers who plant, undercut, windrow, and clip garlic for Valley Garlic undisputedly engage in the same kind of segmented, specialized jobs in Valley Garlic's distribution network as the workers described in *Torres-Lopez*.

Valley Garlic does not disagree that the work it offers is like a specialty job on a production line. *See* Doc. 37 at 17. It simply contends that the non-regulatory factors should "carry little weight here" because, as discussed with regard to non-regulatory factor (4), *infra*, field workers are organized before they arrive at Valley Garlic fields and "often leave to work on other agricultural operations mid-season." *Id.* As the Court explained, no individual factor is dispositive but each is instructive. *See Arredondo*, 922 F.Supp2d at 1076. That said, the Ninth Circuit found the non-regulatory factors to be "particularly probative" of economic reality where the farm operator used workers who were the employees of FLC intermediaries. Perez v. Lantern Light Corp, 2015 WL 3451268, *3 (W.D. Wash. May 29, 2015) (citing *Torres-Lopez*, 111 F.3d at 640); *Rodriguez v. SGLC, Inc.*, 2012 WL 5705992, *8 (E.D. Cal Nov. 15, 2012) (The non-regulatory factors "are derived from the AWPA" and "relate to whether a farmworker is economically dependent on the alleged joint employer.") Even if that were not the case, the Ninth Circuit has instructed courts to "consider all factors 'relevant to the particular situation' in evaluating the 'economic reality' of an alleged joint employment relationship." *Torres–Lopez*, 111 F.3d at 639 (quoting *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir.1983)); *accord Rosales v. El Rancho Farms*, 2011 WL 6153276, *12-13 (E.D. Cal. Dec. 12, 2011) *adopted in full by* 2012 WL 292977 (E.D. Cal Jan. 12, 2012). The non-regulatory

considerations are relevant in this situation. *See*, *e.g.*, *Arredondo*, 922 F.Supp.2d at 1086-1087 (finding a joint employment relationship after considering all of the non-regulatory factors even where the workers were organized into crews and were very mobile).

**Non-Regulatory Factor (2)** – Responsibility under contracts passes from one FLC to another without material change.

Valley Garlic uses the same form contracts with all of its FLCs. Anderson Depo. at 138:10-13. Other than the name and locations of the work, none of the other terms vary depending on FLC. *Id*. at 138:14-17. Responsibility under the contracts passes from one FLC to another without material changes.

**Non-Regulatory Factor (3)** – Premises and equipment of the agricultural employer.

As discussed in the sections regarding regulatory factors (F) and (G) above, Valley Garlic provides the land and most of the tools necessary to complete the jobs that the workers engage in.

**Non-Regulatory Factor (4)** – Existence of a business organization.

The workers in this action were organized by FLCs into crews before they arrived at Valley Garlic fields. Doc. 37 at 17 (citing Anderson Decl. 2 at ¶ 8); Doc. 34 at 23; *cf. Torres-Lopez*, 111 F.3d at 644 (workers heard about work by word of mouth and showed up hoping to be selected for work). Those FLCs created crews could shift as a unit from one agricultural employer to another. *See Arredondo*, 922 F.Supp.2d at 1087 ("Here … workers were part of organized crews that could shift from one worksite to another depending on day.") However, there is no indication in the record that any FLC created crew left Valley Garlic as a unit. Instead, Valley Garlic has submitted testimony that it could not force workers to finish out a workday and that individual "laborers have the freedom to go and work for any other operation that offers more attractive work or compensation, and they often do leave mid-season to work somewhere else." Anderson Decl. 2 at ¶¶ 8, 13, 14. The workers clearly have the option to work for other FLC outfits. What is less clear, based on the evidence submitted, is whether workers actually moved as cohesive units or individually drift between fields and FLCs.

FLC created crews exist that could allow units of workers to shift from jobsite to jobsite.

1   Although the record is absent of any indication of whether that potential was ever realized, this
2   factor tends to weigh against a finding that, as a matter of economic reality, the workers are
3   dependent on Valley Garlic.

4   **Non-Regulatory Factor (5)** – The work did not require judgment or foresight.

5          In a largely identical situation, the Ninth Circuit characterized harvesting work as
6   "'piecework' that requires no great 'initiative, judgment, or foresight." *Torres-Lopes*, 111 F.3d
7   at 644 (quoting *Real*, 603 F.2d at 754). This Court will not depart from that assessment.

8   **Non-Regulatory Factor (6)** – Opportunity for profit or loss.

9          Again, the Ninth Circuit has addressed this factor in a parallel situation: "the farmworkers
10  had no 'opportunity for profit or loss depending upon [their] managerial skill,' [citation] They
11  worked at a piece-rate and the amount of money they earned depended solely upon the" amount
12  harvested or hours worked. *Torres-Lopez*, 111 F.3d at 664.

13          c. Overall Economic Reality

14          Upon weighing of all of the factors, the Court concludes that the field workers recruited
15  by X-Treme Ag and the other FLCs had sufficient economic dependence on Valley Garlic to find
16  that Valley Garlic jointly employed those workers. Because Valley Garlic operates a garlic farm
17  and employees seasonal agricultural workers, it is an agricultural employer.

18          Because Valley Garlic is a joint employer of the field workers—satisfying the second
19  requirement for classification as an agricultural employer—the court need not consider the
20  Secretary's alternative argument: that Valley Garlic solicits migrant and seasonal workers.

21  2. Valley Garlic caused vehicles to be used for transporting workers

22          An agricultural employer can cause a vehicle to be used, within the meaning of Section
23  1841(b), in several ways[10]: First, an agricultural employer causes a vehicle to be used when it
24  directly requires a FLC to provide transportation. *See* 29 C.F.R. § 500.70(c) ("[W]hen an
25  agricultural employer … specifically directs or requests a [FLC] to use the contractor's vehicle to
26  carry out a task for the agricultural employer …, such direction constitutes causing the vehicle to

27  _____

28  [10] This list is not designed to be exhaustive. Whether an agricultural employer causes transportation of a worker is a
    fact intensive inquiry made on a case-by-case basis.

be used….") Second, an agricultural employer causes a vehicle to be used when transportation is a 'necessary element in obtaining the workers' to harvest the [farmer]'s crop." *Saintida v. Tyre*, 783 F.Supp. 1368, 1373 (S.D. Fla. 1992) (quoting *Frenel v. The Freezeland Orchard Company, Inc.*, 1987 WL 46894, *1 (E.D. Va. Dec. 24, 1987)); *accord Cardenas v. Benter Farms*, 2000 WL 1372848, *17 (S.D. Ind. Sept. 19, 2000); *Castillo v. Case Farms of Ohio, Inc.*, 96 F.Supp.2d 578 (W.D. Tex. 1999). Third, an agricultural employer may be liable for causing use of a vehicle in violation of a provision Section 1841(b) based on agency principals. *Cardenas*, 2000 WL 1372848, at *18; *Castillo*, 96 F.Supp.2d at 593.

As to the first method of causing use of a vehicle, the Secretary has provided no evidence to suggest that Valley Garlic directed any FLC to provide transportation. Quite to the contrary, Valley Garlic's contracts with FLCs expressly forbid those FLCs from providing transportation. *See* Doc. 24-1 at 16.

As to the second method, the Secretary contends that "transportation is a necessary element of a Valley Garlic fieldworker's job." Doc. 34 at 36. The Secretary relies on *Saintida* and *Castillo* for the proposition that transportation is necessary "where the fields are in remote locations and the workers don't have access to their own cars or public transportation…." *Id.* (citing *Saintida*, 783 F.Supp. at 1373); see *Castillo*, 96 F.Supp. 2d at 625. The Secretary relies on the geographical scope of the Valley Garlic operation, extending from "'Bakersfield all the way to Oregon,' across seven California cities and five counties and in four Oregon counties," *Id.* (citing Martinez Depo. at 19:4-21:17; Marrione Depo. 16:3-16, 74:15-23; Anderson Depo. at 44:2-7). Many of the workers recruited lived far[11] from the garlic fields which were inaccessible by public transportation. Romero Decl. at ¶ 5; Estrada Decl. at ¶¶ 7-8; Declaration of Jay Lee, Doc. 7-8 ("Lee, J. Decl.") at ¶ 3; Declaration of Yasmin Zuniga, Doc. 7-10 ("Zuniga Decl.") at ¶¶ 4, 6; Hernandez Decl. at ¶ 5; Marrione Depo. at 113:14-114:2. Many of those workers also

---

[11] The Secretary contends that some of the workers lived as far as 80 miles from the fields but the evidence cited is not so explicit. Doc. 34 at 36-37 (citing Marrione Depo at 113:14-114:2; Declaration of Gerardo Romero, Doc. 7-6 ("Romero Decl.") at ¶ 5; Declaration of Ivan Estrada, Doc. 7-7 ("Estrada Decl.") at ¶¶ 7-8). However, the Court takes judicial notice of the fact that the distance between Merced, California and Gilroy, California is roughly 80 miles. Fed. R. Evid. 201. Additionally, at least one worker stated that she worked in a field approximately an hour and a half from her house, Declaration of Petra Hernandez, Doc. 7-11 ("Hernandez Decl.") at ¶ 5, and Valley Garlic does not dispute that some of the workers lived far from the fields.

lacked personal vehicles. Romero Decl. at ¶ 7; Lee, J. Decl. at ¶ 3; Zuniga Decl. at ¶¶ 4-5. The Secretary's position is that, as a result of the long distances between workers' homes and the worksites, the lack of public transportation, and lack of personal vehicles (in some cases), X-Treme Ag's crew leaders promised to drive workers "as a matter of necessity in carrying out X-Treme Ag's contractual duty to supply workers to Valley Garlic." Doc. 34 at 37.

Valley Garlic contends that the Secretary's position is too expansive; that, under the Secretary's theory, any time workers do not live at or near a worksite the agricultural employer would have caused a vehicle to be used for transportation within the meaning of Section 1841(b). Valley Garlic correctly notes that the inquiry is not whether a worker must drive to work, but whether employer-provided transportation is necessary in order to secure the attendance of the workers. Doc. 37 at 21; *see Castillo*, 96 F.Supp.2d 624 n. 55 ("Without [agricultural employer or FLC] assistance with transportation, the workers would not come to work.")

The Secretary explains that the practice of X-Treme Ag crew leaders providing transportation to workers in the 2015 season was "pervasive"; at least seven of the eleven X-Treme Ag. crew leaders of crews providing labor to Valley Garlic transported workers in the 2015 season. Declaration of Assistant Director Nora Pedroza, Doc. 7-4 ("Pedraza Decl.") at ¶ 4. Based on the frequency of FLCs providing transportation, the lack of personal vehicles by many of the workers, and the absence of public transportation, it appears that X-Treme Ag was only able to provide the labor required under the contract with Valley Garlic by providing transportation to at least some of those workers.

Valley Garlic also contends that, at the time of the automobile accident, it "had no idea that the FLC was transporting workers," and that "[b]ased on the type and number of vehicles that Valley Garlic's Field Manager observed … it seemed like the workers drove themselves … [or] privately-arranged carpools…." Doc. 37 at 21 (citing Anderson Decl. 2 at ¶ 18). Presumably, Valley Garlic believes that Section 1841(b) liability cannot attach unless the Secretary proves that Valley Garlic had actual knowledge that it caused its FLCs to provide transportation to workers. In sum, Valley Garlic suggests that it cannot have caused transportation of workers within the meaning of Section 1841(b) because it contractually required its FLCs not to transport

1   workers and presumed that those FLCs would follow the agreement.

2        The Secretary responds an agricultural employer can violate Section 1841(b) intending

3   that a FLC to provide transportation (or even knowing that a FLC is providing transportation) if

4   transportation is a necessary element of the job. Doc. 38 at 7.  The Court agrees. An agricultural

5   employer cannot deny causing transportation of workers by contracting with a FLC for provision

6   of seasonal workers (many of whom only work for a day or two) to rural and diffuse worksites

7   without access to public transportation and simply assuming that those workers will drive

8   themselves or carpool with each other, ignoring the reality of the situation. *See Castillo*, 96

9   F.Supp.2d at 624; *Saintida*, 783 F.Supp. at 1373. Finding that such a practice would not

10  constitute "causing to be used a vehicle for transportation" would result in the perverse outcome

11  of rewarding agricultural employers who are purposefully blind to the very practices that the

12  AWPA seeks to prevent. *See* 29 U.S.C. §§ 1801 (The purpose of the AWPA is to "assure

13  necessary protections for" and prevent "activities detrimental to migrant and seasonal

14  agricultural workers"), 1841(b). Moreover, limiting application of Section 1841(b) to situations

15  where an agricultural employer specifically directs or asks a FLC to provide transportation is an

16  outcome rejected by both *Castillo* and *Saintida*. *Id.*

17        Even assuming that an agricultural employer must know that transportation is necessary

18  to violate Section 1841(b), the "pervasive" nature of the violation tends to indicate that Valley

19  Garlic knew (or was willfully ignorant to) the necessity for FLCs to provide transportation to

20  secure the requisite labor.  Seven of eleven X-Treme Ag crew leaders provided workers with

21  transportation to Valley Garlic worksites in the 2015 harvest season. Pedraza Decl. at ¶ 4. The

22  workers who did not get rides with X-Treme Ag saw X-Treme Ag provide transportation and

23  easily identified the crew leader vehicles because they carried water coolers for workers.

24  Declaration of Pablo Tranquilino, Doc. 7-9 ("Tranquilino Decl.") at ¶¶ 6-7. The crew leaders

25  were also easily identified because they usually supervising work rather than actually doing the

26  harvesting activity. *See* Anderson Depo. at 133:2-8. It is certainly reasonable to infer that Valley

27  Garlic personnel—at least one of whom was in the field for at least a majority of the time that

28

1  workers were present, *see* Anderson Depo. at 82:1-5, 93:3-9, 101:8-20, 149:15-22[12]—would

2  have noticed that the crew leaders transported workers.

3       Even accepting, *arguendo*, that Valley Garlic had "no idea" that its FLCs transported

4  workers prior to the accident, in considering forward-looking injunctive relief the Court

5  considers what Valley Garlic continues to cause transportation of workers that it now certainly

6  knows that its FLCs have provided. Letter from C. Marrione to I. Camacho, Doc. 7-2 at 105; *see*

7  Marrione Depo. at 116:7-25; *see also Stewart v. Everett*, 804 F.Supp. 1494, 1498 (M.D. Fla.

8  1992) (considering that the FLC continued unlawfully transporting workers even after an

9  accident involving those workers). Valley Garlic has taken no steps to prevent transportation of

10  workers by its FLCs. *See* Martinez Depo. 65:17-66:15; Marrione Depo. at 63:7-23; Anderson

11  Depo. at 164:1-165:5. In fact, despite the DOL's findings that FLCs providing transportation to

12  Valley Garlic in the 2015 season was pervasive, Valley Garlic continues to rely only upon the

13  provision in its contracts prohibiting transportation that failed before. Valley Garlic appears

14  committed to ignoring the reality that FLC-provided transportation to its fields is a necessary

15  element to recruitment of at least some of its workers. If nothing else, Valley Garlic's use of

16  FLCs to recruit for its remote fields and its failure to take any substantive action to prevent or

17  redress known transportation of workers causes transportation of workers within the meaning of

18  Section 1841(b).

19       As to the third method of causing transportation, the Secretary alleges that an agency

20  relationship exists between Valley Garlic and X-Treme Ag such that Valley Garlic is responsible

21  for X-Treme Ag causing transportation within the scope of that relationship. The Court has

22  found that Valley Garlic caused vehicles to be used because transportation was a necessary

23  element of production of the employees. As such, it need not address this argument.

24  3. Valley Garlic failed to ensure that licensing of drivers and safety of vehicles

25       As an agricultural employer that caused vehicles to be used to transport of workers,

26

27  ---
   [12] In this Court's previous order in this action, it relied upon a declaration from Elvis Martinez that he was

28  "[f]requently … at a particular field for just a few minutes." The Secretary has since made clear that at least one
   Valley Garlic worker is present at each step of the planting and harvesting processes. Anderson Depo. at 72:12-15,
   82:1-5, 93:3-14, 101:18-20, 114:4-12.

Valley Garlic was required to "ensure that [the vehicles used] conform[ed] to the [safety] standards prescribed by the Secretary" and "ensure that each driver ha[d] a valid" driver license. 29 U.S.C. § 1841(b)(1)(A-B).

It is undisputed that Valley Garlic did nothing to ensure that the vehicles that it caused to be used to transport workers were safe or drive by licensed drivers. *See* Anderson Depo. at 156:4-10. In fact, at least one of those vehicles, the auto accident underlying this action, was driven by an unlicensed driver. Declaration of Investigator Billy Lee, Doc. 7-5 ("Lee, B. Decl.") at ¶ 5d.

**B. Irreparable Injury**

1. Presumption of Irreparable Injury

The Secretary contends that he is not required to prove irreparable injury because the injunction sought seeks to prevent violation of the AWPA which specifically authorizes injunctive relief. 29 U.S.C. § 1852(a) (Section 1852(a) authorizes "the Secretary … [to] petition any appropriate district court … for temporary or permanent injunctive relief if the Secretary determines that [the AWPA] has been violated.) Doc. 34 at 15 (citing *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir. 1983) ("The standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief"); *United States v. Nutri-cology, Inc.*, 982 F.2d 394, 498 (9th Cir. 1992) ("In statutory enforcement cases where the government has met the 'probability of success' prong of the preliminary injunction test, we presume it has met the 'possibility of irreparable injury' prong because the passage of the statute is itself an implied finding by Congress that violations will harm the public."))[13]

Valley Garlic responds that presumptions of irreparable injury have been cast into doubt by *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008) and *eBay v.*

---

[13] The Secretary raised a similar argument in *Perez v. Blue Mountain Farms*, 961 F.2d 1164, 1167 n 1 (E.D. Wa 2013). The court declined to address the issue, instead assuming that four-factor equitable test applied and finding that irreparable harm was shown. *Id*. at 1167, 1171. In this case, as the Court will discuss in Section IV(B)(2), *infra*, the Secretary has not made a showing that irreparable injury is likely to result in the absence of preliminary injunctive relief. As a result, the Court must resolve whether the Court may presume irreparable injury from a showing of the likelihood of success on the merits.

*Mercexchange*, 547 U.S. 388, 392-394 (2006). Two distinct arguments exist for why presumptions of irreparable harm may not exist post-*Winter* and post-*eBay*: First, the *Winter*—likelihood of harm—standard cannot be met by the presumption. Second, no presumption is appropriate post-*Winter* because each of the elements of the four-factor test must be applied. The Court addresses both.

a. Impact of the Shift from Possibility of Irreparable Harm to Likelihood of Irreparable Harm

Valley Garlic calls the Court's attention to *Anselmo v. Mull*, 2012 WL 5304799, *7-8 (E.D. Cal. Oct. 25, 2012), where the court declined to apply a presumption of irreparable injury where a county government sought to enjoin violation of permitting and zoning requirements. *See also Facebook, Inc. v. Power Ventures, Inc.*, 2013 WL 5372341, *14 n 15 (N.D. Cal. Sept. 25, 2013) (declining to apply a presumption of irreparable injury in light of *eBay* even though injunctive relief was authorized by statute). The *Anselmo* court explained that the presumption of irreparable harm was "tied to the Ninth Circuit's sliding scale standard for preliminary injunctions that allowed a showing of only the possibility of irreparable harm if the plaintiff made a strong showing of success on the merits." *Anselmo*, 2012 WL 5304799 at *7; *see United States v. Nutri-cology*, *Inc.*, 982 F.2d at 398. In *Winter*, the Supreme Court rejected the "possibility" standard as too lenient. *Anselmo*, 2012 WL 5304799 at *7 (quoting *Winter*, 555 U.S. at 22). Rather than a "possibility" of irreparable harm, the proponent of a preliminary injunction must show "that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. The *Anselmo* court extrapolated that the Supreme Court's disapproval of the "possibility" standard may impact the presumption of irreparable harm that was afforded under that lesser standard to statutory violations on issues of public import that specifically authorize injunctive relief. *Anselmo*, 2012 WL 5304799 at *7. In sum, the *Anselmo* court questioned the validity of the presumption of irreparable injury for statutory violations because it was unclear to the court whether that presumption presumed that irreparable injury was merely *possible*—which would not satisfy the irreparable injury requirement post-*Winter*—or *likely*—which would.

The presumption of irreparable injury applied in this Circuit was drawn, at least in part,

1  from circuits that continued to apply the presumption after rejecting possibility of irreparable

2  injury standard in favor of the likelihood standard. *See United States v. Odessa Union*

3  *Warehouse Co-Op.*, 833 F.2d 172, 175 (9th Cir. 1987) (citing *SEC v. Management Dynamics,*

4  *Inc.*, 515 F.2d 801, 808 (2nd Cir. 1975)); *City of New York v. Golden Feather Smoke Shop, Inc.*,

5  597 F.3d 115, 120 (2d Cir. 2010) (continuing to apply the presumption of irreparable injury after

6  having rejected the possibility standard)[14]; *see also United States by Mitchell v. Hayes Int'l*

7  *Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969) ("Where … the statutory rights of employees are

8  involved and an injunction is authorized by statute and the statutory conditions are satisfied …

9  the usual prerequisite of irreparable injury need not be established and the agency to whom the

10  enforcement of the right has been entrusted is not required to show irreparable injury before

11  obtaining an injunction.") Moreover, some district courts in this Circuit have continued to apply

12  a presumption of irreparable injury (or simply granted injunctive relief without a showing of

13  irreparable harm), where statutory authority articulates conditions for injunctive relief, without

14  voicing the *Anselmo* court's concerns. *See, e.g., Constr. Laborers Trust Fund For S. California*

15  *Admin. Co. v. Play Smart Surfacing, Inc.*, 2013 WL 6007594, *6 (C.D. Cal. Nov. 12, 2013)

16  (quoting *Trailer Train Co*, 697 F.2d at 869) (applying *Trailer Train Co.* to impose a preliminary

17  injunction for violation of ERISA, which explicitly authorizes injunctive relief, without a

18  showing of irreparable injury, consideration of a balance of the equities, or consideration of the

19  public interest); *Facebook, Inc. v. Fisher*, 2011 WL 250395, *3 (N.D. Cal. Jan. 26, 2011)

20  (enjoining violation of the CAN-SPAM Act which specifically authorizes injunctive relief, 15

21  U.S.C. § 7706(g)(1)(A)); *United States v. Organic Pastures Dairy Co.*, 708 F.Supp.2d 1005,

22  1011-1012 (E.D. Cal. 2010) (enjoining violation of the FDCA which specifically authorizes

23  injunctive relief, 21 U.S.C. § 332(a)); *see also*, *United States v. Cole*, 2014 WL 1303143, *3 (D.

24  Or. Mar. 31, 2014). Still other district courts in this Circuit have identified similar concerns to

25

---

26  [14] Until the late 1970s, the Second Circuit allowed issuance of an injunction upon a showing of "probable success on
the merits and the possibility of irreparable injury." *E.g., Charlie's Girls, Inc. v. Revlon, Inc.*, 483 F.2d 953, 954

27  (2nd Cir. 1973). The Second Circuit expressly parted from that standard in *New York v. Nuclear Regulatory
Commission*, 550 F.2d 745, 755 (2d Cir. 1977) and again in *Jackson Dairy Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d

28  70, 72 (2nd Cir. 1979), in both of which it made clear that a "likelihood," not a "mere possib[ility]," of
irreparable injury is necessary to warrant injunctive relief.

1  those raised in *Anselmo*—that *Winter* may change the irreparable injury standard applicable to all

2  actions for injunctive relief—but have declined to require a showing of irreparable injury for

3  statutorily authorized injunctions. *See S.E.C. v. Capital Cove Bancorp LLC*, 2015 WL 9704076,

4  *5 (C.D. Cal. 2015); *S.E.C. v. Schooler*, 902 F.Supp.2d 1341, 1345 n. 2 (S.D. Cal. 2012).

5      This Court is not persuaded that the *Nutri-cology* explanation that the presumption of

6  irreparable injury was sufficient to meet the "possibility of irreparable harm" standard meant that

7  the presumption was sufficient *only* to meet that standard; instead, the court highlighted that the

8  "possibility of irreparable harm" standard was met because it was the standard applicable at the

9  time. *See Nutri-cology*, 982 F.2d at 498.  The continued application of presumptions of

10 irreparable injury post-*Winter* in (at least some) cases seeking statutory injunctions and the

11 history of the presumption convince the Court that presumptions of irreparable injury that existed

12 before *Winter* were not impacted by the shift in standard from possible irreparable harm to likely

13 irreparable harm. Correspondingly, insofar as Valley Garlic argues that a presumption of

14 irreparable injury should not apply because such a presumption, although sufficient to meet the

15 now-defunct possibility standard, is insufficient to satisfy the higher likelihood of irreparable

16 injury standard, this Court rejects that argument.

17      b. Validity of Categorical Rules or Presumptions of Irreparable Injury

18      Valley Garlic's objection to a presumption of irreparable injury could also be reasonably

19 read to suggest that *eBay* (or *Winter*) eliminates all presumptions of irreparable injury. *See* Doc.

20 37 at 26 (*Trailer Train Co.* and *Nutri-cology* "are no longer good law.") This Court does not read

21 *eBay* (or *Winter*) or the Ninth Circuit's examination of it in *Perfect 10, Inc. v. Google, Inc.*, 653

22 F.3d 976, 979-980 (9th Cir. 2011), to eliminate all presumptions of irreparable injury. As this

23 Court will now explain, *eBay* precludes presumptions of or categorical rules regarding

24 irreparable injury unless Congress has restricted the traditional equitable jurisdiction of the court.

25 In other words, courts are required to apply the "traditional four-factor framework that governs

26 the award of injunctive relief" unless Congress clearly indicates otherwise. *Perfect 10*, 653 F.3d

27 at 979 (quoting *eBay*, 547 U.S. at 394); *see Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*,

28 654 F.3d 989, 995 (9th Cir. 2011); *but see Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d

1165, 1175–76 (9th Cir. 2010) ("The standard requirements for equitable relief need not be

satisfied when an injunction is sought to prevent the violation of a federal statute which

specifically provides for injunctive relief.")[15] In *Perfect 10* and more recently in *Cottonwood*, the

Ninth Circuit reaffirmed that (in light of *Winter*, *eBay*, and *Amoco Products Company v. Village

of Gambell*, 480 U.S. 531, 542 (1987)) application of any presumption in favor of injunctive

relief is unwarranted unless Congress expresses its intent, through the statute authorizing

injunctive relief, explicitly, "or by necessary and inescapable inference, [to] restrict[] the court's

jurisdiction in equity." *Cottonwood Environmental Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075,

1089-1090 (9th Cir. 2015) (quoting *Amoco Prod. Co.*, 480 U.S. at 542); *accord Porter v. Warner

Holding Co.*, 328 U.S. 395, 398 (1946); *Perfect 10*, 653 F.3d at 979-980.[16] If a court's equity

jurisdiction is not restricted, "the full scope of that jurisdiction is to be recognized and applied."

*Porter*, 328 U.S. at 398. When considering an equitable injunction, courts should not truncate the

four-part inquiry by presuming any element or place their "thumb on the scales." *Cottonwood*,

789 F.3d at 1089 (quoting *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010)).  The

fact that injunctive relief is explicitly permitted for violation of an Act is not an indication of

Congressional intent to replace the elements of the traditional four-part test. *Id*. at 1089-1090. In

determining whether Congress intended to preclude court exercise of equitable jurisdiction, the

courts may consider an Act's "language, history, and structure," *Tennessee Valley Authority v.

Hill*, 437 U.S. 153, 174 (1978), as well as its "underlying substantive policy, *Amoco*, 480 U.S. at

554. *Cottonwood*, 789 F.3d at 1090; *United States v. Massachusetts Water Resources Authority,*

---

[15] The validity of *Antoninetti* was put in question two years later by *Meyer v. Portfolio Recovery Associates, LLC*,
707 F.3d 1036, 1044 (9th Cir. 2012), suggesting that whether presumptions of irreparable injury can ever be applied
post-*eBay* and post-*Winter* is an open issue. Moreover, the *Antoninetti* court did not discuss whether presumptions in
favor of irreparable harm survived the Supreme Court's decisions in *eBay*, *Winter*, and *Monsanto*; it simply relied on
Ninth Circuit precedent that predated those cases.

[16] The Second Circuit appears to be of a different understanding. It continues to apply what it has referred to as "the
'well established rule' that governmental agencies enforcing federal law 'need not prove irreparable injury or the
inadequacy of other remedies as required in private litigation suits.'" *City of New York v. Golden Feather Smoke
Shop, Inc.*, 597 F.3d at 120-121. In order to be entitled to injunctive relief, such "statutory guardian[s], charged with
safeguarding the public interest," must only prove "likely success on the merits" and "reasonable likelihood that the
wrong will be repeated." *Id*. at 121; *see also SEC v. Torr*, 87 F.2d 449, 450 (2d Cir. 1937) ("As the issuance of an
injunction in cases of this nature has statutory sanction, it is of no moment that the plaintiff has failed to show
threatened irreparable injury or the like, for it would be enough if the statutory conditions for injunctive relief were
made to appear.")

1  256 F.3d 36, 51 (1st Cir. 2001).

2  This Court's research has yielded no case where a court has discussed whether the

3  language of Section 1852 or the AWPA generally, expresses a clear congressional intent to

4  restrict the court's consideration of equity factors. In fact, all of the cases that the Court reviewed

5  considering whether to preliminarily enjoin violation of the AWPA contained full considerations

6  of the traditional four-factor test. *See, e.g.*, *Perez v. Howes*, 7 F.Supp.3d 715, 729 (W.D. Mich.

7  2014); *Perez v. Blue Mountain Farms*, 961 F.Supp.2d at 1167-1168; *Metzler v. Lykes Pasco,*

8  *Inc.*, 972 F.Supp. 1438, 1445 (S.D. Fla. 1997); *Sedano v. Mercado*, 1992 WL 454007, *5 (D.

9  N.M. Oct. 8, 1992); *see also Mullins v. City of New York*, 634 F.Supp.2d 373, 387 (S.D. N.Y.

10  2009) (declining to apply a presumption of irreparable harm in an private action seeking to

11  enjoin violation of the FLSA); *but see Perez v. Jie*, 2014 WL 1320130, *2 (W.D. Wash. Mar. 31,

12  2014) (noting in dicta in a FLSA action that the Ninth Circuit does not require a showing of

13  irreparable harm to prevent violation of a statute that provides for injunctive relief); *Perez-Farias*

14  *v. Global Horizons, Inc.*, 2009 WL 1011180, *16-17 (E.D. Wash. Apr. 15, 2009) (characterizing

15  injunctive relief under AWPA is "a statutorily-conferred power" rather than a "function of the

16  [c]ourt's equitable powers" but requiring application of the four-factor equitable test) *rev'd on*

17  *other grounds* 499 Fed.Appx. 735 (9th Cir. 2012) . Moreover, the Supreme Court has noted that

18  the Secretary's authority to seek injunctive enforcement of the FLSA—after which the AWPA is

19  modeled—is rooted "in equity." *See Mitchell v. Robert DeMario Jewelry, Inc.* 361 U.S. 288, 292

20  (1960). However, the fact that no court has applied a presumption of irreparable harm in actions

21  brought by the Secretary to enjoin violation of the AWPA is not dispositive on the issue. The

22  Court turns to consideration of the text of Section 1852.

23  Authorizing statutes using language like, "the court may" or "in accordance with the

24  principals of equity," are read as clear Congressional indications of a lack of intent to strip a

25  court's equity jurisdiction. *See, e.g., Perfect 10*, 653 F.3d at 980 (quoting *eBay*, 547 U.S. at 392;

26  35 U.S.C. § 283); *United States v. Massachusetts Water Resources Authority,* 256 F.3d 36, 51

27  (1st Cir. 2001) (citing 41 U.S.C. § 300g-3(b) (explaining that granting the court authority to enter

28  a "judgment as public health may require" indicated that Congress did not, "by necessary and

29

inescapable inference," eliminate the equitable jurisdiction of the court and therefore the traditional four-factor equitable test must apply before an injunction can issue). When an Act authorizing injunctive relief for its violation is silent regarding a court's inherent authority to exercise equitable jurisdiction, Congress has not foreclosed exercise of such equity jurisdiction. *Porter*, 328 U.S. at 397-398; *see F.T.C. v. Commerce Planet, Inc.*, 815 F.3d 593, 598-599 (9th Cir. 2016). That said, some courts have declined to apply the traditional four-factor test in favor of truncated approaches that incorporate the same equitable considerations even where those courts conclude that Congress did not intend to limit the district court's equity jurisdiction. *See Chester ex rel. N.L.R.B. v. Grane Healthcare Co.*, 666 F.3d 87, 95-96 (3rd Cir. 2011) (applying a two-part test "incorporate[ing] equitable factors into [the] analysis" where the Director of the National Labor Relations Board sought to enjoin violation of the NLRA as authorized by 29 U.S.C. § 160(j)[17] "[i]n light of  the purposes behind th[e] provision and the Act," the "unique" character of the statutory scheme, and the fact that the board sought to vindicate public (rather than private) rights); *accord Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844 (5th Cir. 2010).

On the other end of the spectrum, examples of Congressional intent to eliminate equity considerations in suits by enforcement agencies are few:  the FDCA provides most settled example, 21 U.S.C. § 332(a) ("The district courts of the United States and the United States courts of the Territories shall have jurisdiction, for cause shown to restrain violations of section 331 of this title…."), *see United States v. Organic Pastures Dairy Co.*, 708 F.Supp.2d at 1011-1012 (citing *United States v. Odessa Union Warehouse Co-op*, 833 F.2d at 176); although less settled, enforcement of securities law provides another example, 15 U.S.C. §§ 77t(b), 78u(d), *S.E.C. v. Schooler*, 902 F.Supp.2d 1341, 1345 n. 2 (S.D. Cal. 2012). *See also* Joshua A. v. Rocklin Unified School Dist., 559 F.3d 1036 (citing 20 U.S.C. § 1415) (an automatic stay provision providing that "during the pendency of any proceeding conducted pursuant to this section … the child shall remain in the then-current educational placement…" was self-executing and did not require a parent to show likely success on the merits of the underlying claim or

---

[17] 29 U.S.C. § 160(j) authorizes the NLRB to petition the district court to enjoin "any person … engaged in … an unfair labor practice." It further provides the district court with "jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper." 29 U.S.C. § 160(j).

1   irreparable harm).

2       *S.E.C. v. Schooler*, 902 F.Supp.2d at 1344-1345, is illustrative: The *Schooler* court begins

3   by noting that the SEC is not "the typical private litigant, but a 'statutory guardian charged with

4   safeguarding the public interest in enforcing securities law.'" *Id*. at 1344. Much in the same way,

5   the Secretary of Labor is the guardian charged with safeguarding the public interest in enforcing

6   labor standards. *See, e.g.*, 29 U.S.C. §§ 202, 1801, 1852. The *Schooler* court goes on to explain

7   that the action for injunctive relief pursued by the SEC is a "creature of statute." *S.E.C. v.*

8   *Schooler*, 902 F.Supp.2d at 1344 (citation omitted). However, the statutes authorizing the

9   granting of injunctive relief do not "provide the exact standard to be applied; they merely

10  authorize district courts to grant injunctive relief 'upon a proper showing.'" *Id*. (citing 15 U.S.C.

11  §§ 77t(b), 78u(d)). Although the substance of the statutes at issue in *Schooler* and the statute at

12  issue in the present case differ, their structures are roughly the same. *Compare* 15 U.S.C. §

13  77t(b) ("Whenever it shall appear to the commission that any person [has or will violate] the

14  provisions of this subchapter …, the Commission may, in its discretion, bring an action in any

15  district court of the United States … to enjoin such acts or practices, and upon a proper showing,

16  a permanent or temporary injunction or restraining order shall be granted without bond....") *with*

17  29 U.S.C. § 1852(a) ("The Secretary may petition any appropriate district court of the United

18  States for temporary or permanent injunctive relief if the Secretary determines that this chapter,

19  or any regulation under this chapter, has been violated.") Both statutes authorize the statutory

20  guardian to seek injunctive relief but neither explicitly sets the standard for issuance of an

21  injunction. Despite the requirements set forth by *Winter* for equitable injunctions, the *Schooler*

22  court applied a modified, two-part test for issuance of the statutory injunction sought, asking: (1)

23  whether there a prima facie showing of violation of federal securities law, and (2) whether there

24  was a likelihood of repetition. *S.E.C. v. Schooler*, 902 F.Supp.2d at 1344-1345 (collecting cases).

25  The *Schooler* court recognized an absence of uniformity regarding the standard to be applied

26  after *Winter,* but continued to apply the two-part test because the SEC failed to direct the court to

27  a "single SEC enforcement action seeking injunctive relief" that had departed from the two-part

28  test in favor of the four-factor standard of *Winter. Id* at 1345 n 2.

This Court does not read the text of Section 1852 or the AWPA generally to demonstrate a clear Congressional intent to limit district courts' equity jurisdiction. Refusal to find a limitation on the Court's equity jurisdiction in the AWPA context is consistent with the authority in AWPA cases requiring proof from the Secretary of all four of the equitable considerations, *See, e.g.*, *Perez v. Howes*, 7 F.Supp.3d 715, 729; *Perez v. Blue Mountain Farms*, 961 F.Supp.2d at 1167-1168, and the Supreme Court's broad pronouncement that plaintiffs seeking preliminary injunctive relief must establish all of the four equity considerations, *see Winter*, 555 U.S. 20. In sum, the Court declines to apply any presumption or categorical rule regarding a the Secretary's required showing of whether irreparable harm will result if the Court refuses to issue preliminary injunctive relief.

2. Adequacy of Showing of Irreparable Harm

As discussed above, if the Court does not issue an injunction specifically precluding Valley Garlic from causing seasonal employees to be transported in violation of Section 1841, Valley Garlic will continue to rely upon FLCs who provide transportation as a necessary component of providing the required labor. The remote nature of the fields, the lack of access to public transportation, and the lack of access to personal vehicles for many workers virtually guarantees such an outcome. The Secretary contends that transportation of workers in violation of Section 1841—without ensuring that the drivers are licensed and the vehicles are safe—will cause serious injury or death to workers and those they share the road with. Doc. 7 at 21-22. He continues, "there is no question that had Valley Garlic taken steps to ensure that the driver was licensed and that the vehicle was safe before the accident took place, *the accident likely never would have happened*." Doc. 38 at 2-3 (emphasis in original).

Valley Garlic disputes whether irreparable injury is *likely* if injunctive relief is not granted and contends that the auto accident was unrelated to the protections afforded by Section 1841.

There is no dispute that death or disabling injury as a result of an auto accident constitutes irreparable harm. *Metzler v. Lykes Pasco, Inc.*, 972 F.Supp. at 1445; *see Harris v. Board of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004). The Secretary has also shown a

1  substantial likelihood that that transportation is a necessary component of FLCs providing

2  workers to Valley Garlic and that such transportation by FLCs is likely to continue. However,

3  simply put, the Secretary has provided no evidence to substantiate his claim that irreparable

4  injury is likely, rather than merely possible in light of the ongoing transportation of workers.

5      The Secretary has provided no evidence regarding any of the vehicles used for

6  transportation of workers other than the vehicle involved in the accident. The vehicle involved in

7  the accident is alleged to have been unsafe because the sliding door did not open without

8  considerable effort. *See* Lee, J. Decl. at ¶ 7. Although the Secretary alleges that ensuring that the

9  vehicle was safe would likely have prevented the accident, it is not apparent to the Court how

10  repairing a faulty door would have prevented the driver from falling asleep at the wheel or

11  impacted the severity of the injuries. Doc. 7-5 at 21; *see also* Doc. 7-5 at 23, 26 ("The occupants

12  in the rear of [the vehicle] were unrestrained … [and] were ejected" from the vehicle. The

13  seatbelts appeared to be operational but not in use. No "mechanical defects that would have

14  contributed to the cause of the collision" were noted.) Moreover, no showing has been made that

15  any vehicle used for transportation of workers failed or fails to comply with the safety standards

16  such that it is likely to cause irreparable injury. *Cf. Metzler v. Lykes Masco, Inc.*, 972 F.Supp. at

17  1440 (holding that the Secretary showed irreparable injury where workers continued to be

18  transported in unsafe vehicles where the Secretary submitted evidence that four of the nine

19  vehicles inspected were unsafe and in use and eight of the nine did not); *Melendez v. Sweetser*,

20  1992 WL 453979, *1, 4-5 (holding that irreparable injury was likely if continued transportation

21  was not enjoined where an accident was caused by a FLC's use of a vehicle with brakes known

22  to be faulty, the FLC continued to transport workers in unsafe vehicles, and the FLC was issued

23  repeated citations for unpermitted transportation, transportation in unsafe vehicles, and failure to

24  carry required insurance). Similarly, the Secretary has submitted evidence only regarding the

25  lack of driver license of the driver of the vehicle involved in the accident. Again, although the

26  Secretary suggests that the accident would have been avoided if Valley Garlic had complied with

27  Section 1841, there is no logical connection between lack of a driver license and an injury caused

28  by falling asleep at the wheel. Further, the Secretary has made no showing that any of the other

1  drivers who transported or will transport workers were or are unlicensed (and therefore

2  presumably unsafe drivers).

3        Based on the Secretary's showing on the merits, the Court can conclude that, absent an

4  injunction, Valley Garlic is likely to continue to violate Section 1841 by failing to ensure that

5  vehicles that transport workers are safe and that their drivers are licensed. However, violation of

6  Section 1841 does not constitute irreparable harm *per se*, *see Winter*, 555 U.S. at 22 (A

7  preliminary injunction is an extraordinary remedy, not awarded as a matter of right but only

8  "upon a clear showing that the plaintiff is entitled to such relief."), and the Secretary has not

9  made the requisite showing that irreparable injury is *likely* to result. A finding that Valley

10 Garlic's ongoing failure to ensure vehicle safety or driver license status is likely to cause

11 irreparable injury would be wholly speculative based on the absence of evidence before the

12 Court.

13 **C. Balance of the Equities and Public Interest**

14        As noted in Section IV(B)(1), *infra*, the Court applies no presumption that public policy

15 favors the Secretary's position. That said, the Court is also not blind to the Congressional goal of

16 deterring violations of the AWPA and ensuring worker health and safety. *See Barajas v.*

17 *Bermudez*, 43 F.3d 1251, 1257 (9th Cir. 1994). The Secretary clearly seeks to force Valley Garlic

18 to hire FLCs registered with the Secretary to transport workers or to ensure that FLCs not

19 registered with the Secretary to transport workers do not do so in violation of the AWPA. Both

20 of those goals are in the public interest insofar as they are required by the AWPA.

21        Despite the goals advanced by the secretary being in the public interest, in light of the

22 absence of evidence to support a conclusion that irreparable harm will result if the Court does not

23 enjoin Valley Garlic from causing transportation of workers, imposing additional requirements

24 on Valley Garlic to compel compliance with the AWPA would be of unknown benefit. The

25 Court gives little consideration to the cost that Valley Garlic would be required to incur to

26 comply an injunction because those costs would require Valley Garlic only to do what is already

27 required of it under the AWPA. *See Marshall v. Chala Enterprises, Inc.*, 645 F.2d 799, 804 (9th

28 Cir. 1981) (quoting *Mitchell v. Pidcock*, 299 F.2d 281, 287 (5th Cir. 1962)); *Perez v. Blue*

*Mountain Farms*, 2015 WL 6869191 at \*8.  Upon the showing made, the balance of the equities does not strongly weigh in favor of either party.

**D. Conclusion**

Valley Garlic has likely violated and will likely continue to violation Section 1841. However, the Court will not presume irreparable harm from a violation of the AWPA and the Secretary has failed to show a likelihood of irreparable harm in the absence of injunctive relief. The absence of a showing of irreparable harm is fatal to the Secretary's motion for preliminary injunction.

**V. Order**

Based on the foregoing, IT IS HEREBY ORDERED that Plaintiff's motion for preliminary injunction is DENIED.

IT IS SO ORDERED.

Dated:  February 27, 2017

SENIOR  DISTRICT  JUDGE